*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-83

JOHN DOE NO. 1, APPELLANT

v.

SUSAN L. BURKE, APPELLEE.

Appeal from the Superior Court of the District of Columbia
(CAB-7525-12)

(Hon. Maurice A. Ross, Trial Judge)

(Argued January 29, 2014                        Decided May 29, 2014)

*Christopher J. Hajec*, with whom *Michael E. Rosman* was on the brief, for appellant.

*William T. O'Neil* for appellee.

*James A. McLaughlin* for *amicus curiae* Reporters Committee for Freedom of the Press, the American Civil Liberties Union of the Nation's Capital, American Society of News Editors, Digital Media Law Project, Gannett Co., Inc., the McClatchy Co., National Press Photographers Association, and the Washington Post. *Bruce D. Brown* and *Gregg P. Leslie* were on the brief for *amicus curiae*.

Before EASTERLY, *Associate Judge*, and SCHWELB and FARRELL, *Senior Judges*.

EASTERLY, *Associate Judge*:   A "strategic lawsuit against public participation" or "SLAPP" is a lawsuit "filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." D.C. Council, Comm. on Pub. Safety and the Judiciary, Report on Bill 18-893 ("Comm. Report") at 1 (Nov. 18, 2010). SLAPPs "masquerade as ordinary lawsuits," *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003) (internal quotation marks omitted), but a SLAPP plaintiff's true objective is to use litigation as a weapon to chill or silence speech. The District recently enacted the D.C. Anti-SLAPP Act to protect the targets of such suits. D.C. Code § 16-5501 to -5505 (2012 Repl.). Invoking this statute, anonymous speaker John Doe No. 1 filed a special motion to quash a subpoena issued by Susan L. Burke seeking his identifying information. *See* D.C. Code § 16-5503. The trial court denied the motion and John Doe No. 1 now seeks interlocutory review. Addressing the Anti-SLAPP statute for the first time, we begin by assessing whether the denial of a special motion to quash under the statute may be immediately appealed to this court. We answer that question in the affirmative and then consider whether the trial court correctly denied the special motion to quash. We determine that it did not. Accordingly, we reverse.

## I.     Facts[1]

Appellee Susan L. Burke is an attorney based in the District of Columbia who litigates in state and federal courts across the country.  She founded her own law firm to pursue her interest in human rights litigation and a focus of her practice is advocacy for those allegedly harmed by the misconduct of U.S. military personnel and government contractors.  For example, Ms. Burke represented a group of former detainees held at Abu Ghraib prison in Iraq in their suit against federal government contractors working at that site.  In 2007, Ms. Burke filed a civil lawsuit seeking to vindicate the rights of Iraqi civilians and their families who were victims of the 2007 civilian shootings in Baghdad by individuals who worked for the company then known as Blackwater (now Academi).  *See Abtan v. Blackwater Lodge & Training Ctr.*, 611 F. Supp. 2d 1 (D.D.C. 2009).  That lawsuit was settled in 2010.

In October 2011, an individual known only as RetroLady64 created a webpage for Ms. Burke on Wikipedia.  Wikipedia is a "collaboratively edited,

---

[1]  Because of the procedural posture of this case, the trial court has not yet made factual findings.  But the relevant facts, as alleged by the parties in their trial court filings, are not in dispute.

multilingual, free-access, free content Internet encyclopedia" and any visitor to the website has the ability to add, edit, or remove content.[2]  The Wikipedia entry for Ms. Burke discussed, among other things, her civil suit against Blackwater:

> Burke represented plaintiffs . . . in a lawsuit against Blackwater.  The lawsuit stemmed from the firefight in Niso[u]r Square in Baghdad.  The lawsuit alleged Blackwater violated the federal Alien Tort Statute in committing extrajudicial killing and war crimes, and that the company was liable for assault and battery, wrongful death, intentional and negligent infliction of emotional distress, and negligent hiring, training and supervision.  The lawsuit was dismissed in 2010.

Three months later, in January 2012, appellant John Doe No. 1, whose Wikipedia user name is "Zujua," added information in the section of Ms. Burke's page that addressed the *Abtan* litigation.  This information had nothing to do with Ms. Burke or the *Abtan* civil suit; instead it related to the troubled federal criminal prosecution of the Blackwater contractors arising from the same incident in Nisour Square.[3]  As modified by Zujua, the section of Ms. Burke's page that addressed the *Abtan* litigation read (Zujua's additions are italicized):

---

[2]  Wikipedia, http://en.wikipedia.org/wiki/Wikipedia (last visited May 27, 2014).

[3]  As the source for this information, Zujua cited to a December 2009 article in the New York Times:  *See* Charlie Savage, *Judge Drops Charges from*

(continued…)

Burke represented plaintiffs . . . in a lawsuit against Blackwater. The lawsuit stemmed from the firefight in Niso[u]r Square in Baghdad. The lawsuit alleged Blackwater violated the federal Alien Tort Statute in committing extrajudicial killing and war crimes, and that the company was liable for assault and battery, wrongful death, intentional and negligent infliction of emotional distress, and negligent hiring, training and supervision. *Judge Urbina threw out the suit in December 2009, saying that "the court declines to excuse the government's reckless violation of the defendants' constitutional rights as harmless error," after they attempted to use as evidence the defendants' compelled statements taken under threat of the loss of their jobs. Judge Urbina went on to criticize prosecutors for withholding "substantial exculpatory evidence" from the grand jury, and presenting "distorted versions" of witness' testimony.* The lawsuit was dismissed in 2010.

Ms. Burke saw and removed this information about one month after it was posted. Zujua is not alleged to have taken any further action. A second anonymous user ("CapBasics359"), however, later posted similar language about the 2009 dismissal of the federal government's criminal case to Ms. Burke's Wikipedia page. Ms. Burke again removed the offending statements herself; this time, she also contacted CapBasics359 through Wikipedia to inform him that the information he added did not apply to her case. CapBasics359 then restored the statements about the government prosecution, however, and he and Ms. Burke

---

(…continued)
*Blackwater Deaths in Iraq*, N.Y. Times, Dec. 31, 2009, http://www.nytimes.com/2010/01/01/us/01blackwater.html.

went back and forth several times, with CapBasics359 adding and Ms. Burke deleting this same information.

Suspecting that incorrect additions to her Wikipedia page were the product of a scheme by Blackwater to discredit her, Ms. Burke filed suit in D.C. Superior Court alleging defamation, tortious interference in prospective business advantage, and false light invasion of privacy. She named several anonymous defendants who she asserted had colluded to defame her: Zujua (John Doe No. 1), CapBasics359 (John Doe No. 2), and eight alleged Blackwater employees or agents (John Does 3-10). As Ms. Burke did not know the real names of the Wikipedia users, she was unable to serve them. She therefore issued a subpoena to obtain Wikipedia's user data so that she could obtain the anonymous posters' identifying information.

Zujua, represented by the Center for Individual Rights, moved to quash the subpoena pursuant to the D.C. Anti-SLAPP Act's "special motion to quash" provision, D.C. Code § 16-5503.[4] In the alternative, he sought a protective order preventing the discovery of his identity. On January 30, 2013, the trial court denied Zujua's motion in a one-page order. The court ruled that Zujua was not

---

[4] CapBasics359, the other anonymous Wikipedia editor, is not a participant in the current appeal.

entitled to the protection of the Anti-SLAPP statute because he had not established that he had spoken about "an issue of public interest" within the meaning of the statute. Without further explanation, the court stated that Zujua had both failed to make an affirmative showing that Ms. Burke was a general- or limited-purpose public figure and failed to disprove that his speech was commercially motivated. In addition, the trial court ruled, also without explanation in its order, that even if Zujua's speech was about an issue of public interest, he was not entitled to quash the subpoena because Ms. Burke had demonstrated a likelihood of success on the merits of her defamation claim. Finally, the court denied Zujua's request for a protective order noting that Zujua had provided no authority for such a request. This appeal followed.[5]

## II.     The D.C. Anti-SLAPP Act

In 2010, the Council of the District of Columbia enacted the D.C. Anti-SLAPP Act to protect the targets of SLAPPs and encourage "engag[ement] in political or public policy debates." Comm. Report at 4. Following the lead of a

---

[5] Because we determine that the denial of Zujua's motion to quash the subpoena seeking his identifying information is appealable and that his motion should have been granted, we decline to address his claim that he is separately entitled to a protective order preventing the discovery of his identity.

number of other jurisdictions, the statute creates a "special motion to dismiss," a procedural mechanism that allows a named defendant to quickly and equitably end a meritless suit. D.C. Code § 16-5502. The D.C. statute goes further than the other jurisdictions, however, in its additional protection for anonymous speech. Given that "SLAPP plaintiffs frequently include unspecified individuals as defendants," Comm. Report at 4, and recognizing the importance of anonymous speech on matters of public interest, the D.C. Anti-SLAPP Act also allows "a person whose personal identifying information is sought" to safeguard his identity by filing a "special motion to quash" a subpoena. D.C. Code § 16-5503 (a). An anonymous would-be defendant who is able to protect her identity in this manner can thus avoid being named in a suit and served with a complaint.

To establish the grounds for either of the two procedural protections the Anti-SLAPP statute affords—dismissal of the suit or quashing of a subpoena—the moving party must show that his speech is of the sort that the statute is designed to protect. Specifically, the moving party must "make[] a prima facie showing that the underlying claim arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502 (b); *see also* D.C. Code § 16-5503 (b). Upon such a showing, the motion will be granted unless the opposing party

demonstrates a likelihood of success on the merits of his or her underlying claim.

*Id.*

### III. Appealability of a Special Motion to Quash

Before we may consider the merits of the trial court's order denying Zujua's special motion to quash, we must determine whether such an order can be immediately appealed to this court.[6] *See McNair Builders, Inc. v. Taylor*, 3 A.3d 1132, 1135 (D.C. 2010) ("Before we may decide [the merits of the appeal], we must first determine whether this court has jurisdiction.")

---

[6] We do not address the related but separate question of whether an order denying a special motion to dismiss under the Anti-SLAPP Act is immediately appealable. We note that this was an issue in a different case before this court, *Mann v. Nat'l Review, Inc., et al.,* 13-CV-1043, but the appeal in that case was dismissed before an opinion was issued. Two days before oral argument for this case, the District of Columbia delivered to the court the amicus brief it filed in *Mann*. It is not clear what the District, which is not a party to this case, sought to accomplish, procedurally or substantively, with this submission. While the District is not required to ask permission to be amicus in this court, *see* D.C. App. R. 29 (a), it still must follow other rules pertaining to amicus filings, *see, e.g.,* D.C. App. R. 29 (c)-(e). Moreover, if it meant to participate in this case as amicus by resubmitting its *Mann* amicus brief, that brief provides little guidance regarding the issue before us. In a footnote, the District in *Mann* took the position that whether the denial of a special motion to dismiss is immediately appealable is "related, but quite distinct" from whether the denial of a special motion to quash is appealable, and it never said whether the appealability of these distinct motions should be resolved similarly or differently. We see no reason to address the appealability of the special motion to dismiss in this case.

The appellate jurisdiction of this court is defined by statute. Specifically, D.C. Code § 11-721 (2012 Repl.) gives this court jurisdiction over "all final orders and judgments" of the Superior Court, as well as certain categories of interlocutory orders. D.C. Code § 11-721 (a)(1), (a)(2). Superior Court orders that do not finally resolve pending cases are therefore not ordinarily appealable pursuant to our "general policy against piecemeal review." *Umana v. Swidler & Berlin*, *Chartered*, 669 A.2d 717, 722 (D.C. 1995). Furthermore, we have specifically held that "[a] pretrial order granting or denying discovery from a non-party witness is not ordinarily final for purposes of appeal unless, in the case of an order granting discovery, the subject of the order refuses to comply and is adjudicated in contempt." *Crane v. Crane*, 657 A.2d 312, 315 (D.C. 1995) (emphasis omitted).

With that said, this court also has jurisdiction to hear certain non-final orders not specifically enumerated in our jurisdictional statute. This court has recognized that the collateral order doctrine, first articulated by the Supreme Court in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) and applied to the jurisdictional statute for the federal courts of appeals, 28 U.S.C. § 1291-92 (2012),

likewise applies to D.C. Code § 11-721.[7] *See Stein v. United States*, 532 A.2d 641, 643 (D.C. 1987); *see also, e.g.*, *McNair Builders*, 3 A.3d at 1135-36. The collateral order doctrine "is best understood not as an exception to the final decision rule" codified in this court's jurisdictional statute "but as a practical construction of it." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (internal quotation marks omitted). This doctrine permits appellate courts to assert jurisdiction over a "small class" of otherwise non-final orders, *Stein*, 532 A.2d at 643 (quoting *Cohen*, 337 U.S. at 546), which "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen*, 337 U.S. at 546.

This court, like the Supreme Court, recognizes that "[p]ermitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration and encroaches on the prerogatives of [trial] court judges who play a special role in managing ongoing litigation." *Mohawk Industries v. Carpenter*, 558 U.S. 100, 106 (2009) (internal quotation marks omitted). Accordingly, we have likewise emphasized that the reach of the collateral order doctrine is "modest" and the test

---

[7] D.C. Code § 11-721 is modeled after and "virtually identical" to 28 U.S.C. § 1291-92 (2012). *See Brandon v. Hines*, 439 A.2d 496, 509 (D.C. 1981).

for applying it is "stringent." *McNair Builders*, 3 A.3d at 1136 (quoting *Will*, 546 U.S. at 349-50). Three criteria must be satisfied; the subject order: (1) "must conclusively determine a disputed question of law," (2) "must resolve an important issue that is separate from the merits of the case," and (3) "must be effectively unreviewable on appeal from a final judgment." *McNair Builders*, 3 A.3d at 1135 (quoting *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 339-40 (D.C. 2001) (overruled on other grounds)). Despite this "stringent" test, we conclude that an order denying a special motion to quash under the D.C. Anti-SLAPP Act satisfies the requisite criteria and is immediately appealable to this court.[8] *See id.* at 1140 n.9 (explaining that a determination that an order is appealable under the collateral order doctrine is "not directed at the individual case, but to the entire category to which a claim belongs" (quoting *Mohawk,* 558 U.S. at 101) (internal quotation marks omitted)).

First, the order denying the special motion to quash conclusively determines a disputed question of law. The trial court concluded that "[d]efendant fail[ed] to

---

[8] Because we rely on the collateral order doctrine to resolve the jurisdictional issue, we do not address Zujua's alternative argument that the order denying the special motion to quash amounts to the denial of injunctive relief which is appealable under D.C. Code § 11-721 (a)(2)(A) (identifying as appealable orders "granting, continuing, modifying, refusing, or dissolving or refusing to dissolve or modify injunctions").

present a prima faci[e] case that the writings at issue are protected under the D.C. Anti-[SLAPP] statute." With this order, the court made a determination that Zujua's speech was not of the sort that the Anti-SLAPP statute intends to protect. See *supra* part II. Federal appellate courts that have examined similar state Anti-SLAPP statutes have likewise found the conclusivity element satisfied when a trial court has determined the movant is ineligible for protection under the statute. *See Godin v. Schencks*, 629 F.3d 79, 84 (1st Cir. 2010) ("the order conclusively decides that relief under Maine's [Anti-SLAPP statute] is unavailable to the individual defendants"); *Henry v. Lake Charles Am. Press*, 566 F.3d 164, 174 (5th Cir. 2009) ("an order denying a[] . . . motion [under Louisiana's Anti-SLAPP statute] satisfies any concerns regarding conclusivity").[9]

Next, the order denying the special motion to quash resolves an important issue separate from the merits of the lawsuit. On its face, whether Zujua's anonymous speech qualifies for protection under the statute is a separate question from whether Zujua may be held liable for defamation. Ms. Burke argues that our

---

[9] We note that *Godin* and *Henry* apply the collateral order doctrine to special motions to dismiss. But just as in the statutory schemes reviewed in *Godin* and *Henry*, an anonymous speaker seeking to quash a subpoena in the District carries the burden to present prima facie evidence that his speech is eligible for the Anti-SLAPP statute's protections. See *supra* part II.

analysis cannot stop here, however, and that we must also consider that, upon the presentation of a prima facie case that the movant has engaged in protected activity, the plaintiff may defeat the special motion to quash by showing a likelihood of success on the merits. *See* D.C. Code § 16-5503 (b). This latter inquiry, Ms. Burke asserts, is not sufficiently separate from a merits inquiry. We disagree. Although a plaintiff may defeat a special motion to quash by showing a likelihood of success on the merits, the purpose of this inquiry is still "to determine whether the defendant is being forced to defend against a meritless claim, not to determine whether the defendant actually committed the relevant tort." *Henry*, 566 F.3d at 175 (internal quotation mark omitted); *see also id.* (discussing numerous applications of the collateral order doctrine and concluding that "an order does not have to be separate from the entirety of the underlying dispute to satisfy *Cohen*").[10] Put another way, the "[d]enial of an anti-SLAPP motion resolves a question

---

[10] In *Henry*, the court explained that the separability requirement is meant to promote the collateral order doctrine's goal of encouraging "efficient adjudication. . . . by preventing appeals on issues that will be definitively decided later in the case. In this way, one might characterize separability as a way of ensuring that a movant is not attempting to have an appellate court preemptively resolve a disputed issue still pending in the district court." 566 F.3d at 175-76. But, the court further explained, "issues of immunity [like those considered in evaluating a motion under an Anti-SLAPP statute] are decided prior to trial and then not normally revisited." *Id.* at 176. Because of the nature of the court's inquiry, therefore, the concerns that drive the separability requirement are not relevant here.

separate from the merits in that it merely finds that such merits may exist, without evaluating whether the plaintiff's claim will succeed." *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003); *see also Finkelstein, Thompson & Loughran,* 774 A.2d at 340 (concluding that "the issue of immunity from having to defend against . . . [a] defamation claim is separate from the merits of that claim").

The final requirement to qualify for review under the collateral order doctrine is that the subject order be "effectively unreviewable on appeal from a final judgment." *McNair Builders*, 3 A.3d at 1135. "We have said that the denial of a motion that asserts an immunity from being sued is the kind of ruling that is commonly found to meet the requirements of the collateral order doctrine and thus to be immediately appealable." *Id.* at 1136 (internal quotation marks omitted). Here we consider the denial of a special motion to quash, not the denial of a special motion to dismiss, which explicitly protects the right not to stand trial. But we conclude that the former also confers an immunity of a sort from suit. See *supra* p. 7-8. An anonymous speaker who can preserve his anonymity can avoid service and thereby avoid ever becoming a named party to a suit.

We have explained, however, that it is not enough that the unreviewable interest be in the "mere avoidance of a trial." *McNair Builders*, 3 A.3d at 1136

(quoting *Will*, 546 U.S. at 353). Rather, before we exercise our appellate jurisdiction under the collateral order doctrine we must confirm what is at stake is the "avoidance of a trial that would impair a 'substantial public interest.'" *Id.* at 1137.

The right the Council sought to protect with the special motion to quash is the right to engage in anonymous speech, Comm. Report at 4, which is grounded in the First Amendment to the U.S. Constitution. *See Solers, Inc. v. Doe*, 977 A.2d 941, 950-51 (D.C. 2009).[11] In drafting the District's Anti-SLAPP statute, the Council took into account the experiences of states with similar statutes and determined that, in this respect, the District could do better in offering protection to the intended targets of SLAPP actions. We find it significant in our assessment of the public interest in the right at stake that the constitutional right of anonymous speech is specially protected in the District's Anti-SLAPP statute.[12]

---

[11] While Ms. Burke correctly notes that anonymous defamation is not entitled to constitutional protection, *see Solers,* 977 A.2d at 951, the Council made a legislative judgment in choosing to broadly protect anonymous speech. If truly defamatory, a plaintiff may defeat the motion to quash if she can establish a likelihood of success on the merits. See *infra* part IV.

[12] Citing *Englert v. MacDonell*, 551 F.3d 1099, 1105 (9th Cir. 2009), Ms. Burke argues that because the District's Anti-SLAPP statute does not explicitly provide for the immediate appeal of the denial of a special motion to quash, the

(continued…)

The exercise of the statutorily protected right to anonymous speech would be substantially chilled if the denial of a special motion to quash were not immediately appealable. *See McNair Builders*, 3 A.3d at 1140 ("the crucial question . . . is not whether an interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders."). Deferring review of the denial of a special motion to quash would result in the irreversible loss of the anonymity that the Anti-SLAPP Act specifically seeks to protect. As a result, those who would speak out anonymously might choose not to speak at all. This is precisely the sort of injury to an important public interest that this court has

(…continued)
Council must not have believed that anonymity was an important value worthy of such protection. But because of the limitations placed on the D.C. Council under the Home Rule Act, we conclude that the D.C. Council's failure to codify an immediate appeal provision for the denial of a special motion to quash cannot reasonably be analogized to the Oregon legislature's failure to create an immediate appeal in *Englert*. Congress created the current District of Columbia Courts system, defined the jurisdiction of the District's courts, and prohibited the Council from legislating to expand (or contract) their jurisdiction. Although what constitutes an improper expansion of jurisdiction has been the subject of some dispute in this court, it is clear that this court possesses the sole power to interpret D.C. Code § 11-721, our jurisdiction-conferring statute. It was for these reasons that the Council, which originally sought to create a right of immediate appeal for special motions to dismiss, *see* Comm. Report at 7, deleted this provision. We therefore read little into the absence of a provision that the Council may not have been empowered to include in the first place.

acknowledged that the collateral order doctrine is meant to protect. *See McNair Builders*, 3 A.3d at 1138 (observing that the public interest in protecting the "valid exercise of the constitutional right[] of freedom of speech" and "encourag[ing] continued participation in matters of public significance" would be a "public interest worthy of protection on interlocutory appeal." (quoting *Henry*, 566 F.3d at 169, 180)).

Because each of the criteria of the collateral order doctrine is satisfied, we hold that an order denying a special motion to quash under the D.C. Anti-SLAPP statute will be immediately appealable to this court.

## IV. Assessing the Motion to Quash

Having determined that we have jurisdiction to reach the merits in the instant appeal, we turn to the parties' arguments with regard to the trial court's order denying the special motion to quash. Our review of this issue, a question of statutory interpretation, is de novo. *See Hernandez v. Banks*, 84 A.3d 543, 552 (D.C. 2014).

## A. Prima Facie Case

As noted above, to prevail on a special motion to quash, the moving party must first demonstrate that "the underlying claim arises from an act in furtherance of the right of advocacy[13] on issues of public interest." D.C. Code § 16-5503 (b). An "issue of public interest" is defined positively and negatively in the Anti-SLAPP statute. The statute positively defines it to "mean[] an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place"; the statute then provides that it "shall not be construed to include private interests,

---

[13] The statute defines "[a]ct in furtherance of the right of advocacy on issues of public interest" as:

> (A) Any written or oral statement made:
>
>> (i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or
>>
>> (ii) In a place open to the public or a public forum in connection with an issue of public interest; or
>
> (B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.

D.C. Code § 16-5501 (1). The Superior Court made no specific finding on whether Zujua's Wikipedia edit was "an act in furtherance of the right of advocacy" but found that regardless of the "act" element, Zujua's speech was not on an "issue of public interest." On appeal, Zujua asserts that his Wikipedia edit satisfied this criterion and Ms. Burke makes no argument disputing that assertion.

such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance." D.C. Code § 16-5501 (3). Here, the trial court found that Zujua failed to establish a prima facie case that his speech met this statutory definition both because (1) he did not establish that Ms. Burke was a public figure, and (2) he did not "provide[] prima faci[e] evidence that his comments were not commercially motivated."

To establish that his speech fell within the definition of "issue of public interest" Zujua argued at trial and reiterates on appeal that his Wikipedia edit was on an "issue related to . . . a public figure."[14] D.C. Code § 16-5501 (3). Although the statute does not define "public figure," we presume that the use of this term imports the definition of "public figure" used throughout defamation law. *See 1618 Twenty-First St. Tenants' Ass'n, Inc. v. The Phillips Collection*, 829 A.2d 201, 203 (D.C. 2003) (explaining that as a general rule, we presume that where a

---

[14] Zujua additionally argues that his Wikipedia edit related to an "issue of public interest" because it pertained to Ms. Burke's performance as an attorney and was thus "related to . . . a service in the market place." D.C. Code § 16-5501 (3). The trial court did not address this argument, perhaps because it was raised only in Zujua's reply in support of his motion. We likewise do not address this argument as we find that Ms. Burke is a public figure.

legislature adopts a term of art, it "knows and adopts the cluster of ideas that were attached to each borrowed word").[15]

Like the Supreme Court, this court has recognized two types of public figures in the context of defamation claims:  general and limited purpose public figures.  "[G]eneral purpose public figures . . . because of their 'position of such pervasive power and influence . . . [,] are deemed public figures for all purposes.'" *Moss v. Stockard*, 580 A.2d 1011, 1030 (D.C. 1990) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)).  "[L]imited-purpose public figures," that is, individuals "who assume roles 'in the forefront of particular public controversies in order to influence the resolution of the issues involved,' . . . are deemed public figures only for purposes of the controversy in which they are influential." *Id.* (quoting *Gertz,* 418 U.S. at 345).  "[T]he touchstone remains whether the individual has assumed a role of special prominence in the affairs of society . . . that invites attention and comment." *Id.* (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987)).  While it is clear that Ms. Burke is not a

---

[15]  Federal courts that have examined the D.C. Anti-SLAPP Act have done the same. *See, e.g., Abbas v. Foreign Policy Grp., LLC*, No. 12-1565, 2013 WL 5410410, at *6 (D.D.C. Sept. 27, 2013); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260-62 (D.D.C. 2013).

general purpose public figure, such as a politician or celebrity, both Zujua and the amici argue that she is a limited-purpose public figure.

The task of determining whether a defamation plaintiff is a limited-purpose public figure is a difficult one, requiring a highly fact-intensive inquiry that one court has described as "trying to nail a jellyfish to the wall." *Moss*, 580 A.2d at 1030 (quoting *Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 443 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978)). To facilitate this determination, this court in *Moss* adopted a three-part inquiry articulated by the D.C. Circuit in *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). The court must begin by determining "whether the controversy to which the defamation relates was the subject of public discussion *prior* to the defamation." *Moss*, 580 A.2d at 1030. Next, the court must determine "whether 'a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.'" *Id.* (quoting *Waldbaum*, 627 F.2d at 1297). After identifying the existence and scope of the public controversy, the court will find that a defamation plaintiff is a limited-purpose public figure with respect to that controversy if "[t]he plaintiff . . . achieved a special prominence in the debate, and either 'must have been purposely trying to influence the outcome or could realistically have been expected, because of [her] position in the controversy, to

have an impact on its resolution.'" *Id.* at 1031 (quoting *Waldbaum*, 627 F.2d at 1297).

Applying the *Waldbaum* framework, we hold that Ms. Burke is a public figure. First, the speech at issue here pertains to an obviously public controversy that existed before Ms. Burke's involvement. The 2007 Nisour Square shooting was a significant international event which implicated United States foreign policy and which raised questions about the appropriate use of private contractors in Iraq. Ms. Burke attempts to define the controversy narrowly by asserting that only the private interests of individual clients were at play. But every public controversy involves individuals when examined at some level of granularity, and Ms. Burke's narrow view of the controversy is not reflected in her own descriptions of the high stakes of this litigation in press releases and interviews, where Ms. Burke has said, for example, that the "litigation [would] prove that Blackwater's interests are contrary to the interests of the U.S. military, the State Department, and the nation of Iraq." Press Release, Burke O'Neil LLC, Blackwater Faces New Death and Injury Claims and Drug Allegations (Nov. 27, 2007), *available at* http://burkepllc.com/category/press-releases. Furthermore, it cannot reasonably be disputed that the public "or some segment of it" would "feel the impact" of the

resolution of the controversy about Blackwater's presence in Iraq and its actions in Nisour Square.

Finally, we are asked to examine in-depth Ms. Burke's role in this controversy to determine whether she "achieved a special prominence" such that she was "purposefully trying to influence" an outcome of the controversy. Ms. Burke warns against determining that an attorney is a public figure simply because of her performance of her job duties, namely, zealous advocacy for her clients. Courts in other jurisdictions have taken on the difficult task of determining when an attorney will become a public figure in her representation of clients, with many finding that attorneys whose cases address large-scale public issues or who represent prominent clients and seek extensive media attention will become limited-purpose public figures. *See, e.g.*, *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1083-84 (3d Cir. 1985) (finding that an attorney was a limited-purpose public figure where he "actively participate[d] in the public issue in a manner intended to obtain attention"); *Partington v. Bugliosi*, 825 F. Supp. 906, 917-18 (D. Haw. 1993) (explaining that an attorney who "voluntarily engaged in a course of action with respect to [his representation of his client] that was bound to invite attention and comment" was a limited-purpose public figure); *Ratner v. Young*, 465 F. Supp. 386, 400 (D.V.I. 1979) (noting that attorneys were

limited-purpose public figures where they "voluntarily thrust themselves into the vortex of [a] case that had far-reaching and serious effect[s] on many people not connected with it."). *But see, e.g.*, *Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 584 (8th Cir. 1980) (finding that an attorney was not a limited-purpose public figure due simply to his practice of law in violation of bar discipline); *Marchiondo v. Brown*, 649 P.2d 462, 467-68 (N.M. 1982) (holding that an attorney was not a limited-purpose public figure despite being "well known" in the community).

We agree that "[l]egal representation of a client, by itself, does not establish an individual as a public figure," *Marcone*, 754 F.2d at 1085. In her litigation of high-profile cases like *Abtan,* however, Ms. Burke went above and beyond simple legal representation in court pleadings and appearances. She sought substantial publicity for this case by putting out press releases and giving interviews. (We note that her actions prompted the company formerly known as Blackwater to seek a gag order against her.) By no means do we seek to criticize or challenge her far-reaching and assertive advocacy. We comment on her conduct only to explain how she "assumed the risk that in the course of reporting and commenting on a well known person or public controversy," that public speakers, like Zujua, might "inadvertently make erroneous statements about" her. *See Marcone*, 754 F.2d at 1081.

Thus, Ms. Burke satisfies all three criteria from *Waldbaum*, and we are confident that she has "thrust [herself] to the forefront of . . . [this] public controvers[y]," *Gertz*, 418 U.S. at 345, and can be considered a limited-purpose public figure. The trial court's determination to the contrary was erroneous.

We additionally find error in the trial court finding on Zujua's commercial motivation. It appears to have been the trial court's understanding that in order to establish "an act in furtherance of the right of advocacy on issues of public interest," the anonymous speaker must also disprove commercial motivation, even where such motivation is not apparent from the content of the speech. This apparent presumption of commercial interest has no foundation in the statute which merely states what an issue of public interest is and is not. Moreover, such a presumption is inappropriate in the context of a prima facie showing, for which we have held the burden of proof is "not onerous." *Little v. United States*, 613 A.2d 880, 885 (D.C. 1992). We understand Ms. Burke suspected that Zujua was affiliated with Blackwater and thus had a commercial interest in defaming her.[16]

---

[16] Amici emphasize—and both parties agree—that the fact that a speaker receives compensation for his speech, e.g. he is a paid journalist, does not mean that his statements are "directed primarily toward protecting the speaker's

(continued…)

But her unsubstantiated suspicion did not increase Zujua's initial burden. Indeed, it would turn the statute on its head if a party seeking a special motion to quash had to reveal his professional affiliation or other identifying information to disprove a disqualifying commercial motivation not apparent from his speech alone. We conclude, then, that Zujua established a prima facie case that his speech was worthy of protection under the statute.

## B. Likelihood of Success on the Merits

We next consider whether Ms. Burke is able to show that her "underlying claim" of defamation is likely to succeed on the merits such that the special motion to quash should nonetheless be denied. Without any discussion, the trial court determined that Ms. Burke could make such a showing. We conclude otherwise.[17]

---

(…continued)
commercial interests." Ms. Burke's argument on this point, however, is that Zujua was affiliated with Blackwater and thus shared its commercial interests.

[17] In her complaint, Ms. Burke raised two additional claims: (1) Tortious Interference with Prospective Business Advantage, and (2) False Light Invasion of Privacy. In opposing Zujua's special motion to quash, however, Ms. Burke only argued that her defamation claim was likely to succeed on the merits, and she similarly does not address her other two tort claims in her argument before this court. Thus, she has waived any argument that she is likely to succeed on either of these two claims.

To establish liability for defamation, a plaintiff must show:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)). If the plaintiff is a public figure, however, the fault component embodied in the third defamation element is heightened; the plaintiff must then show by clear and convincing evidence that the defendant's defamatory statement was published with actual malice, i.e. either subjective knowledge of the statement's falsity or a reckless disregard for whether or not the statement was false. *Moss*, 580 A.2d at 1029.

Zujua argues that the malice standard should apply here, and that Ms. Burke is unlikely to succeed on the merits of her defamation claim because Zujua did not publish his statements with malice. Zujua does not contest any of the other elements of the defamation claim, and in particular makes no argument that the Wikipedia edit is not a "false and defamatory statement."

As a preliminary matter, it seems far from clear that Zujua's revisions to Ms. Burke's Wikipedia page even constitute a defamatory statement. We note that Zujua's edit introduced internal inconsistencies and, to anyone with a basic understanding of the distinction between a civil suit and a criminal prosecution, appears barely coherent. Thus, we query whether the edit amounts to a statement of fact capable of defamatory meaning, i.e. that "it tends to injure the plaintiff in [her] trade, profession or community standing, or lower [her] in the estimation of the community." *Moss*, 580 A.2d at 1023. Without argument to the contrary from Zujua, however, we assume without deciding that this first element of defamation has been satisfied.[18]

Having already determined that Ms. Burke is a limited purpose public figure, see *supra* part IV. A., we agree with Zujua that she is required to show malice on Zujua's part in order to succeed on her defamation claim. We conclude that she is unlikely to be able to do so here. Although we have assumed that Zujua's edits would constitute a false and defamatory statement of fact, the lack of clarity of his

---

[18] At oral argument, counsel for Zujua asserted that it had not conceded the information posted by his client was actually defamatory, but this court generally "decline[s] to consider contentions raised for the first time in oral argument, at least absent compelling reasons not apparent here." *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n.8 (D.C. 2001).

revisions provides good evidence of Zujua's state of mind. Zujua's edits do not suggest knowledge of falsity or reckless disregard for whether or not the statement was false. If anything, the edits seem to suggest confusion or honest mistake on Zujua's part. Again, the edited paragraph is internally contradictory and implies that Zujua probably did not understand that the private civil action in *Abtan* and the federal prosecution of the contractors arising out of the same incident were separate legal actions. Moreover, in contrast to the allegations Ms. Burke makes against John Doe No. 2 (CapBasics359), who apparently re-published similar information after she informed him that it was false, Ms. Burke admits that after she apprised Zujua of the problems with the paragraph, he apparently accepted the correction and did not seek to re-publish the information. This too demonstrates a lack of malice. Zujua's failure to inquire further and learn more about the subject and the federal case before he posted his edit might be evidence of negligence, but we do not believe it demonstrates clear and convincing evidence of the "intentional or reckless disregard for [the statement's] falsity." *Moss*, 580 A.2d at 1029.

To be sure, the task of demonstrating malice is difficult for a plaintiff who does not know the identity of the defamatory speaker and cannot argue malice based on the identity and motivations of her alleged defamer. It is not impossible, however, and the circumstances of the alleged defamation may well demonstrate

malice. Furthermore, the D.C. Council articulated a clear policy in favor of anonymous speech when it enacted the D.C. Anti-SLAPP Act and created the special motion to quash. We will neither question this policy judgment nor the Supreme Court case law it builds upon. Like any public figure, Ms. Burke has exposed herself to comment and criticism by virtue of the prominent role she has assumed in this controversy. *See Gertz*, 418 U.S. at 345. While that does not mean that she may be defamed freely, *see id.*, it does mean that she must satisfy the test imposed by the Supreme Court in order to protect the "breathing space" of the constitutional freedom of expression. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964). Because she cannot do so, she is unlikely to succeed on the merits of her defamation claim.

### V. Conclusion

Having determined that this court has jurisdiction to consider this appeal and further holding that Zujua has established a prima facie case under the D.C. Anti-SLAPP statute that was not rebutted by a showing of likelihood of success on the underlying claims, we reverse the Superior Court's January 30, 2013 order and

remand with instructions to enter an order granting Zujua's special motion to quash

Ms. Burke's subpoena.[19]

*So ordered.*

---

[19]   Although Zujua argues on appeal that he was entitled to attorney fees pursuant to D.C. Code § 16-5504 (a), the trial court never addressed this motion because Zujua did not prevail below.  In the absence of a ruling from the trial court, we do not address this argument on appeal.  Zujua may renew his claim for attorney fees once the trial court enters its order quashing the subpoena.