*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-CV-1246 & 20-CV-0387

KENDALL K.W. FELLS, APPELLANT,

v.

SERVICE EMPLOYEES INTERNATIONAL UNION and DISTRICT OF COLUMBIA, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB3079-19)

(Hon. Florence Pan, Trial Judge)

(Argued February 3, 2022                    Decided September 1, 2022)

*Erik S. Jaffe*, with whom *Raymond J. Sterling* and *Brian J. Farrar* were on the brief, for appellant.

*Kathleen M. Keller*, with whom *Devki K. Virk* and *April H. Pullman*, were on the brief, for appellee Service Employees International Union.

*Norah E. Rast*, Special Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time, *Carl J. Schifferle*, Deputy Solicitor General, and *Mark S. Wigley*, Assistant Attorney General, were on the brief, for appellee District of Columbia.

Before BECKWITH and DEAHL, *Associate Judges*, and FISHER, *Senior Judge*.

DEAHL, *Associate Judge*: Kendall Fells was a high-level employee within the Service Employees International Union (SEIU). After his seemingly forced resignation, SEIU issued a press statement tying his departure to an "ongoing investigation" that was triggered by another executive's sexual misconduct, namely, sleeping with subordinates. In announcing Fells' departure, the statement explained that Fells' own "abusive behavior towards . . . predominantly female staff" was brought to light by that investigation. Fells sued SEIU for defamation and related claims. He contends that SEIU's statement falsely implied that he was forced out due to sexual misconduct, when in fact, there is no dispute that Fells' departure was not related to any sexual misconduct.

SEIU filed a special motion to dismiss under the District of Columbia's Anti-Strategic Lawsuits Against Public Participation, or "Anti-SLAPP," Act. D.C. Code §§ 16-5501 to -5505. That Act provides defendants with a mechanism to summarily defeat suits "aimed to punish or prevent opposing points of view." *Am. Stud. Ass'n v. Bronner*, 259 A.3d 728, 733 (D.C. 2021). The trial court found that SEIU made a prima facie case that its speech was protected under the Act, so that Fells' suit would be dismissed unless he could demonstrate a likelihood of success on the merits. *See* D.C. Code § 16-5502(b). The trial court dismissed Fells' claims after concluding he could not meet that standard because SEIU's statement did not imply

that he had engaged in sexual misconduct. Fells now appeals, and we reverse the dismissal of his defamation claim. We conclude, contrary to the trial court's view, that a reasonable jury could find SEIU's statement falsely implied that Fells was ousted for sexual misconduct.

## I.

The core facts are not in dispute. Kendall Fells held various staff and leadership roles over the course of his thirteen-year career with SEIU. At the time of his resignation, Fells was interim President of the National Fast Food Workers' Union, a labor organization within SEIU that grew out of the "Fight for $15" minimum wage movement that he championed. While Fells was in that role, SEIU's President, Mary Kay Henry, began actively encouraging employees to report sexual harassment and abuse amid the #MeToo movement. As a result of several accusations involving inappropriate sexual relationships with subordinates, SEIU suspended its Executive Vice President, Scott Courtney, who resigned shortly thereafter. SEIU's spokesperson told BuzzFeed News that Courtney engaged in "sexual misconduct and abusive behavior," as revealed through a still-ongoing

"internal investigation launched to look into . . . sexual misconduct and abusive behavior towards union staff."[1]

Ten days later, Fells resigned, seemingly under threat of termination. SEIU's spokesperson issued a statement to multiple news outlets regarding Fells' and another employee's contemporaneous departure, indicating that those "personnel actions" were the result of its aforementioned "ongoing internal investigation" and pertained to "serious problems related to abusive behavior towards staff, predominantly female staff." The statement in its entirety read as follows:

> As a result of information that has come to light through our ongoing internal investigation, today SEIU took action on two senior staff. These personnel actions are the culmination of this stage of the investigation, which brought to light the serious problems related to abusive behavior towards staff, predominantly female staff. We know that progress does not stop with these personnel actions alone. [SEIU] President Henry has taken important steps toward ensuring that our workplace environment reflects our values, and that all staff is respected, their contributions are valued, and their voices are heard.

Several media outlets then published articles connecting Fells' and Courtney's resignations and, in at least one instance, expressly attributing Fells' ouster to sexual

---

[1] Cora Lewis, *A Top Labor Executive Has Resigned After Complaints About His Relationships With Female Staffers*, BuzzFeed News (Oct. 23, 2017), .

misconduct allegations.[2]  In fact, as SEIU concedes, Fells' departure was not related to any claims of sexual misconduct.

Fells sued SEIU for (1) defamation, (2) false light invasion of privacy, (3) public disclosure of private information, and (4) intentional infliction of emotional distress.  SEIU filed a special motion to dismiss under the District's Anti-SLAPP Act, asserting that its statements were made "in furtherance of the right of advocacy on issues of public interest."  D.C. Code § 16-5502(a).  After briefing, the court held an evidentiary hearing on the motion, as required by statute.  D.C. Code § 16-5502(d).

At the hearing's conclusion, the trial court found that SEIU made a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest," satisfying its initial burden under the Act.

---

[2] *See* Penny Starr, *Tally: Four SEIU Officials Out of a Job Because of Sexual Misconduct Charges*, Breitbart (Nov. 4, 2017), www.breitbart.com/politics /2017/11/04/tally-four-seiu-officials-out-of-a-job-because-of-sexual-misconduct-charges/; https://perma.cc/VE5G-CWEL; *see also* Cora Lewis, *The Organizing Director of the Fight for 15 Has Resigned Amid Harassment Investigation*, BuzzFeed News (Nov. 2, 2017), www.buzzfeednews.com/article/coralewis/seiu-new-york-director-of-the-fight-for-15-resigned; https://perma.cc/B7HV-D38K. The other articles that the Superior Court considered were part of a factual proffer made by Fells at a hearing on SEIU's special motion to dismiss.

D.C. Code § 16-5502(b). The court reasoned that Fells' ouster satisfied the statutory definition of an "issue of public interest" for two distinct reasons: (1) it pertained to "community well-being"; and (2) Fells is a limited-purpose "public figure" on issues related to the treatment of women in the workplace. *See* D.C. Code § 16-5501(3). The latter conclusion was based on Fells' leadership role in SEIU and the multiple media appearances and statements he had made in connection with workers' rights, sometimes regarding sexual harassment specifically. With SEIU having made out a prima facie case, the burden shifted to Fells under the statute to demonstrate a likelihood of success on the merits.

The court concluded that Fells had not met that burden. There was no express defamation, the court reasoned, because SEIU's press statement did not expressly state that Fells had engaged in any sexual misconduct. As for implied defamation, the court opined that a BuzzFeed article about the series of firings and resignations, *supra* note 2, was the strongest basis for an implied defamation claim. After scrutinizing that article, however, the court concluded that Fells was not likely to succeed on the merits because a reader would not "reasonably understand" from the article "that Mr. Fells was being investigated for sexual misconduct."

The court dismissed all of Fells' claims with prejudice and later awarded SEIU $98,025.68 in attorneys' fees and costs pursuant to the Anti-SLAPP Act's fee-shifting provision.  Fells now appeals.

## II.

At the outset, we note that Fells' only preserved challenge is to the dismissal of his defamation claim.  His opening brief did not challenge the dismissals of his other claims, as SEIU correctly points out, and so we affirm those dismissals.[3]  Our focus is thus exclusively on the propriety of the dismissal of his defamation claim under the Anti-SLAPP Act.

---

[3] In his reply brief, Fells asserts that he did in fact raise a challenge to the dismissal of his other claims in his opening brief.  As support for that assertion, he points us to a single sentence in his opening brief's recitation of facts in which he says that "the court disposed of each of the claims" based on the same "narrow view."  His reply brief then argues "[i]f that reasoning was erroneous as to one it was erroneous as to all."  Maybe so, but he did not urge that inference or make that argument in his opening brief, and so he waived it. *Stockard v. Moss*, 706 A.2d 561, 566 (D.C. 1997) ("It is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief.").  The premise of his argument is also subject to serious doubt with regard to the public disclosure and intentional infliction of emotional distress claims, as the trial court gave independent reasons that those claims were not likely to succeed on the merits.

The District's Anti-SLAPP Act protects the free exercise of political rights by allowing defendants to quickly dispense with suits "filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016) (quoting Report on Bill 18-893, at 1). The Act permits a defendant to file a "special motion to dismiss" in which they "must first show entitlement to the protections of the Act by 'mak[ing] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest.'" *Id.* at 1227 (quoting D.C. Code § 16-5502(b)). If the defendant is able to make this prima facie showing, the burden then shifts to the plaintiff to produce evidence showing that they are "likely to succeed on the merits." D.C. Code § 16-5502(b).

The "likely to succeed on the merits" standard in the Anti-SLAPP context does not require a plaintiff to show that it is more likely than not that they will succeed, as the statutory language seems to say. Imposing that high of a bar for a suit to survive a motion to dismiss would raise "serious constitutional concerns." *Mann*, 150 A.3d at 1235. To avoid those concerns, we have interpreted the phrase to mean that a plaintiff need only "present an evidentiary basis that would permit a reasonable, properly instructed jury to find in the plaintiff's favor." *Id.* at 1262. This standard is akin to the summary judgment standard under Superior Court Rule of

Civil Procedure 56, except that the non-moving party bears the burden under the Anti-SLAPP Act. *Id.* at 1237.

We review the Superior Court's application of the Anti-SLAPP Act de novo. *Saudi Am. Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.* (*SAPRAC*), 242 A.3d 602, 610-11 (D.C. 2020). For the reasons that follow, we agree with the trial court that SEIU made out a prima facie case "that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). We disagree, however, with its conclusion that Fells failed to show that his implied defamation claim was "likely to succeed on the merits" under the refined standard articulated in *Mann*.[4]

## A. SEIU's Prima Facie Case that Anti-SLAPP Act Applies

In filing a special motion to dismiss under the Anti-SLAPP Act, SEIU had the initial burden of providing "a prima facie showing" that Fells' defamation claim

---

[4] Fells also argues that if the trial court's ruling is allowed to stand, then the Anti-SLAPP Act is unconstitutional as applied to him. The District of Columbia filed a brief responding to that argument. Because we reverse the Superior Court's dismissal of Fells' defamation claim, and he did not preserve any challenge to the dismissal of his remaining claims, *supra* note 3, we do not reach his challenges to the Act's constitutionality.

"arises from an act [1] in furtherance of the right of advocacy [2] on issues of public interest." D.C. Code § 16-5502(b). This burden is not onerous, *Doe No. 1 v. Burke* (*Burke I*), 91 A.3d 1031, 1043 (D.C. 2014), and the trial court found SEIU met it. Fells now argues that SEIU's statement is not covered by the Anti-SLAPP Act because it was neither (1) "in furtherance of the right of advocacy," nor (2) related to "issues of public interest." We address each argument in turn.

### 1. *"In Furtherance of the Right of Advocacy"*

Fells first argues that SEIU's statement did "not even remotely constitute 'advocacy,'" as contemplated by the Anti-SLAPP Act, because it "advocated nothing." It was instead an announcement "of a private employment action terminating the employment relationship between SEIU and Fells," in his view. His argument does not withstand scrutiny.

The Anti-SLAPP Act defines advocacy very broadly. In defining what constitutes an "*[a]ct in furtherance of the right of advocacy* on issues of public interest," it includes "[a]ny . . . *expression or expressive conduct . . . communicating views to members of the public* in connection with an issue of public interest." D.C. Code § 16-5501(1). Focusing just on the italicized phrases—setting aside the "issue of public interest" language addressed in the next subsection for a moment—it is

clear that advocacy refers to anything that is expressive and communicates views to members of the public. That would seem to encompass any public expression of views whatsoever. Fells never attempts to reconcile his argument with this statutory definition.

Fells persists that his lawsuit differs substantially from those targeted by the "central purpose of the Act" because he "has no intention of intimidating SEIU into silence on the issue of workplace sexual harassment." Maybe so, but even if we accept Fells' description of the Act's central purpose, its plain terms clearly extend beyond that core purpose. We have rejected a similar attempt to distinguish between the category of suits to which the Act applies on its terms and those that are "classic SLAPP suits" in the fee-shifting context, noting that "nowhere does the Act refer to or define a 'classic' SLAPP suit, as distinct from one against which the defendant may invoke the statute's protections after a threshold prima facie showing." *Doe v. Burke* (*Burke II*), 133 A.3d 569, 573 (D.C. 2016). The same is true here. This is a broadly-worded statute, and for better or worse, its terms extend beyond lawsuits meant to silence one side of a public policy debate. Nothing in the legislative history that Fells relies on suggests that was an unintended consequence of inartful legislative drafting, as opposed to a deliberate choice that the statute sweep broadly.

Fells also contends that the press statement was more a statement of fact than of any particular opinion, so that it did not express "views" as that term is used in the statutory definition above. That is wrong for two reasons. First, as a descriptive matter, the statement went beyond recounting facts to expressing opinions, such as describing workplace abuse as a "serious problem[]" that it is "important" to take steps to root out, and that Fells' ouster constituted "progress." Second, even recounting facts can constitute expressing views if the surrounding context makes it clear that the speaker has some opinion about those facts, as here. In *Fridman v. Orbis Bus. Intel. Ltd.*, for instance, we held that purely factual assertions in the now-infamous Steele Dossier regarding the nature of the plaintiffs' relationship with Russian President Vladimir Putin "communicate[d] the view that [plaintiffs] are powerful figures who can affect relations between Russia and the United States." 229 A.3d 494, 504 (D.C. 2020). In finding those defendants had made a prima facie case under the Anti-SLAPP Act, we rejected the plaintiffs' argument that "the phrase 'communicating views' applies only to beliefs or opinions and cannot be 'stretched to encompass the compiling and conveyance of raw intelligence.'" *Id.* at 503. Much like the "raw intelligence" in *Fridman*, even the factual portion of the statement with which Fells takes issue communicated views about the circumstances surrounding Fells' termination to the press. *Id.* at 504. It conveyed that workplace abuse was conduct worthy of termination and should not be tolerated.

## 2.  Related to an "Issue of Public Interest"

We now turn to whether SEIU made out a prima facie case that the statement was related to an "issue of public interest."  The Act defines "[i]ssue of public interest" as "an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place."  D.C. Code § 16-5501(3).  We "liberally interpret[]" what qualifies as an issue of public interest, and a given statement need only "relate" (rather than expressly refer to) one of the above topics to fall within the Act's protections.  *SAPRAC*, 242 A.3d at 611.  The Superior Court determined that because Fells held a leadership role in SEIU—"the second largest Union" representing about "two million workers"—"his firing and the circumstances surrounding it . . . is a matter of public interest."  SEIU now offers two independent justifications for that conclusion, tracking the statutory definitions above: (1) that the statement "related to health or safety" or "community well-being," and (2) that it related to "a public figure."  We consider those contentions in turn.

### i.  SEIU's Statement Related to Health or Safety, or Community Well-Being

The trial court was correct that a high-level employee's misconduct-related separation from the second-largest labor union in the country is of public interest.

How workers are treated at one of our nation's largest labor unions undoubtedly relates to community well-being, so much so that the proposition approaches the self-evident.[5]  The public generally has an interest in the standards to which various organizations hold their high-level employees.  That is particularly true when the organization is a labor union that bills itself as fighting against the very type of abuses that several of its leaders were accused of committing.

Fells counters by pointing to a carve-out in the Act, which states that an "issue of public interest . . . shall not be construed to include private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance." D.C. Code § 16-5501(3).  In his view, SEIU's statement falls into that category because it addressed a purely private concern related to a personnel matter.  We disagree, for three reasons.

---

[5] Other courts are in accord.  For example, in *Dossett v. Ho-Chunk, Inc.*, the court was clear that "[a]lleged workplace misconduct by the highest-ranking legal officer in a national organization that resulted in discipline is of interest to more than just the alleged victims of the misconduct, as it puts future employers, colleagues, and others on notice of alleged misconduct and resulting discipline."  472 F. Supp. 3d 900, 909 (D. Or. 2020); *see also McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 109 (2007) (noting that a sports coach's firing was important not only to those immediately affected by it, but also to fans of the team and competitor schools).

First, both the statutory text and our precedents make clear that statements "intermixing public and private interests" fall within the scope of the Anti-SLAPP Act. *SAPRAC*, 242 A.3d at 611. The fact that SEIU's statement partially concerned a private matter does not bring it outside of the Act, "so long as it [was] not 'directed primarily' at a private interest." *Id.* (quoting D.C. Code § 16-5501(3)).

Second, SEIU used Fells' separation as a moment to reassure the broader community of its values regarding the appropriate treatment of workers. That is undoubtedly an issue of public concern, on which SEIU holds itself out as a standard-bearer. We have previously held that statements that on their face are "mostly" about a single individual, even one who was deemed not to be a public figure, may nonetheless relate to "larger concern[s] . . . of community well-being." *Id.* at 612-613 & n.13. The same is true here. SEIU's statement described the organization's views that: abusive behavior toward staff was a "serious problem"; that "progress does not stop with these personnel actions"; and that it would continue to take "important steps toward ensuring that our workplace environment reflects our values." Placed in the context of the #MeToo movement and SEIU's ongoing investigation into the misconduct of its own higher-ups, this was another of its entries into the public debates about worker's rights and workplace abuse.

Third, while Fells speculates about the self-interested reasons SEIU had for disseminating this press statement—including what he describes as SEIU's desire to pander to its mostly female base with "virtue-signaling" around the #MeToo movement—that is of no moment. Even if there was some commercial motivation behind SEIU's statement, that would not mean that the statement pertained primarily to private interests. A speaker need not "disprove commercial motivation . . . where such motivation is not apparent from the content of the speech," *Burke I*, 91 A.3d at 1043, and SEIU need not disprove any private motivation here. A speaker's self-interested motivations say little about whether the content of their speech is related to issues of public interest. In our country's fiercest public debates, some of its loudest voices are quite handsomely paid for expressing their views, and are no doubt at least partially motivated by that remuneration. That does not change the fact that the content of their commentary relates to issues of public interest.

## ii.  There Was a Prima Facie Case that Fells Was a Limited-Purpose Public Figure

Having already concluded that SEIU made out a prima facie case under the Anti-SLAPP Act—that its statement was "[1] in furtherance of the right of advocacy [2] on issues of public interest"—we might bypass the question of whether SEIU presented a prima facie case that Fells was a public figure. We nonetheless think it

prudent to address the public figure question, in the interests of judicial efficiency, because it affects the showing Fells will ultimately need to make to sustain a defamation claim on remand. *See Mann*, 150 A.3d at 1251 (there is a "heightened showing of fault—actual malice—that must be proved in defamation cases that rely on statements made about public figures concerning matters of public concern") (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). We agree with the trial court that SEIU presented a prima facie case that Fells was a limited-purpose public figure.

Section 16-5501(3) defines an "issue of public interest" to include "an issue related to . . . a public figure." The Act does not define public figure, however, so we have imported the relevant standards applied in defamation law. *Burke I*, 91 A.3d at 1041. Those standards instruct that there are both "general public figures," and "limited-purpose public figures." No one contends that Fells is a general public figure, which is somebody who has "achieve[d] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). SEIU contends only that he is a limited-purpose public figure, a label that applies to those who "assume roles 'in the forefront of particular public controversies in order to influence the resolution of the issues involved,' and who are deemed public figures only for purposes of the

controversy in which they are influential." *Moss v. Stockard*, 580 A.2d 1011, 1030-31 (D.C. 1990) (quoting *Gertz*, 418 U.S. at 345).

We apply a three-part test when determining whether somebody is a limited-purpose public figure: (1) "whether the controversy to which the defamation relates was the subject of public discussion prior to the defamation"; (2) whether the subject of the alleged defamation "achieved a special prominence in the debate," either by "purposely trying to influence the outcome" or because the plaintiff "could realistically have been expected, because of his position in the controversy, to have an impact on its resolution"; and (3) if the first two elements are satisfied, whether the alleged defamation was germane to the role the subject played in the public controversy. *Id.* An allegedly defamatory statement is germane unless it is "wholly unrelated to the controversy" for which the plaintiff is a limited-purpose public figure. *Id.* at 1031. There is sufficient evidence that Fells satisfies that three-part test.

As to the first prong, it is uncontested that the controversy relates to a subject of public discussion. The only disagreement between the parties is what that relevant controversy is, and how one frames it could affect the second and third parts of the test considered below. SEIU seeks to frame it broadly as a controversy about "the

treatment of workers." If that is the correct framing, then the second and third steps of this test become quite easy, as Fells does not dispute that he attained a special prominence in that discussion and that SEIU's statement pertained to it. Fells therefore seeks to frame the relevant controversy more narrowly, as one about "sexual harassment and abuse," as "brought to prominence by the #MeToo movement," a subcategory where his prominence was at the very least diminished. We will assume, without deciding, that Fells' framing of the relevant controversy is the better one, because even under that framing he satisfies the limited-purpose public figure test.

As to the second prong, there is substantial evidence that Fells achieved "special prominence" in the debate, even when narrowly framed as one about sexual harassment and abuse. Despite Fells' attempts to describe himself as simply an advocate for fair wages, he was much more than that as interim President of the National Fast Food Workers' Union. By its nature, his role as a high-level union representative who frequently spoke in the press suggests an intent and capacity to influence the outcome of the debate surrounding all manner of labor concerns. *See Cox v. Galazin*, 460 F. Supp. 2d 380, 389-90 (D. Conn. 2006) (collecting cases and endorsing view that "[u]nion officers are generally held to be public figures for purposes of union business where their activities place them in a controversy which

invites scrutiny of their integrity, character, and professional ability"). In fact, contrary to Fells' assertions, there is substantial support for the proposition that Fells "voluntarily thrust" himself into the debate on sexual harassment in the workplace in particular. *Burke I*, 91 A.3d at 1042-43.[6]

As to the third prong, the alleged defamation was germane to the role Fells played in the public controversy. Fells' alleged employee mistreatment cannot be considered "wholly unrelated" to the controversy for which he was a public figure: proselytizing about unionizing as a means of tamping down on workplace misconduct. It is, in fact, a very tight fit.

---

[6] *See e.g.*, Emily Peck, *McDonald's Workers Detail Horrifying Sexual Harassment*, Huffington Post (Oct. 5 2016), www.huffpost.com/entry/mcdonalds-harassment-complaint_n_57f5385ae4b0b7aafe0b4584; https://perma.cc/BY6V-QEC3 ("Fells said that his organization regularly hears complaints from McDonald's workers about sexual harassment," and quoting him as saying, "[i]f these workers had a union the process would be a lot different. You would have a voice on the job."); Daniel Wiessner, *McDonalds, Franchisees Hit with Sexual Harassment Complaints*, Reuters (Oct. 5, 2016), www.reuters.com/article/us-mcdonalds-complaint/mcdonalds-franchisees-hit-with-sexual-harassment-complaints-idUSKCN1251YN; https://perma.cc/U9RR-ST6J (quoting Fells because of his status as "organizing director for Fight for $15," "[a] union-backed group" that "had filed complaints on behalf of 15 U.S. McDonald's workers who say they were sexually harassed on the job").

We thus agree with the trial court that SEIU made out a prima facie case that its speech related to issues of public interest. SEIU did so in two ways: (1) it demonstrated that the statement was related to health or safety, or community well-being, and (2) it presented substantial evidence that the statement pertained to a limited-purpose public figure.

## B. Likelihood of Success on the Merits

Because SEIU made a prima facie showing in support of its special motion to dismiss under the Anti-SLAPP Act, the burden shifts to Fells to show that his defamation claim was "likely to succeed on the merits." D.C. Code § 16-5502(b). Fells contends that he met that burden because reasonable jurors could conclude that SEIU's statement falsely implied that he was fired for sexual misconduct. The trial court disagreed, but in doing so, it seemed to apply an erroneously heightened standard of what it means to show a likelihood of success under the Anti-SLAPP Act. Correcting for that misstep, we conclude that Fells demonstrated a likelihood of success on the merits so that his defamation claim may proceed.

## 1. The "Likely to Succeed on the Merits" Standard

In order to rebut a defendant's prima facie case that the Anti-SLAPP Act applies, the plaintiff must "demonstrate[ ] that the claim is likely to succeed on the merits." D.C. Code § 16-5502(b). As we explained in *Mann,* the "[u]se of the word 'demonstrate' indicates that once the burden has shifted to the claimant, the statute requires more than mere reliance on allegations in the complaint, and mandates the production or proffer of evidence that supports the claim."[7] 150 A.3d at 1233. But we also clarified that the Act does not require a plaintiff to show that it is more likely than not that they have a meritorious claim. That interpretation, while perhaps the most natural reading of the statute, would raise "serious constitutional concerns," as it would threaten to "encroach[] on the role of the jury." *Id.* at 1235. To avoid those constitutional concerns, we interpreted the phrase to mean that the plaintiff must

---

[7] While it is true that we likened the standard we articulated in *Mann* to the summary judgment standard under Superior Court Rule of Civil Procedure 56, that similarity does not extend to the allocation of the burden, as Fells asserts. Both the Act and *Mann* are clear that the non-moving party seeking to defeat an Anti-SLAPP special motion to dismiss bears the burden of showing a likelihood of success. *Mann*, 150 A.3d at 1238 n.32 ("[T]he special motion to dismiss is different from summary judgment in that it imposes the burden on plaintiffs and requires the court to consider the legal sufficiency of the evidence presented before discovery is completed. As concerns the standard to be employed by the court in deciding whether to grant the motion, however, the question is substantively the same: whether the evidence suffices to permit a jury to find for the plaintiff.").

"present an evidentiary basis that would permit a reasonable, properly instructed jury to find in the plaintiff's favor." *Id.* at 1262. In other words, dismissal should follow "only if the court can conclude that the claimant could not prevail *as a matter of law*, that is, after allowing for the weighing of evidence and permissible inferences by the jury." *Id.* at 1236.

It is not clear that the trial court applied this more relaxed standard, rather than the "more likely than not to succeed" standard we rejected in *Mann*. The trial court did not reference *Mann*, or otherwise demonstrate an understanding that Fells' burden was more akin to the burden on a party seeking to avoid summary judgment, namely, to show that material facts were in genuine dispute. *Id.* at 1237. Instead, the trial court appears to have inserted its own assessment of the merits without any recognition that the phrase "likely to succeed on the merits," as it appears in the Anti-SLAPP statute, should not be given its most literal interpretation. Because our review is de novo, any potential misstep about the applicable standard does not affect our analysis. But the possible confusion compels us to reiterate that the likelihood of success standard in the Anti-SLAPP Act is a more relaxed standard than is apparent from the face of the statute.

*2. Did SEIU's Statement Imply that Fells Was Ousted for Sexual Misconduct?*

When properly understood, the question at this stage is whether Fells presented evidence from which a reasonable jury might conclude that he was defamed. *Id.* at 1262. Fells has no viable claim for express defamation—SEIU's statement did not expressly state he was terminated for sexual misconduct[8]—leaving him to resort to a theory of implied defamation.

Defamation by implication concerns not what somebody literally stated, but what their statement implies. *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000); *see also White v. Fraternal Ord. of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). To sustain a defamation-by-implication claim, Fells had to demonstrate that SEIU's statement, viewed in its entire context: (1) "was capable of bearing a defamatory meaning"; and (2) "that it contained or implied provably false statements of fact." *Guilford*, 760 A.2d at 597. Because no one contends that Fells was ousted for sexual misconduct, there is no dispute that he has satisfied the second part of that

---

[8] Fells raises in a footnote the possibility that SEIU defamed him by asserting that he engaged in any kind of "abuse," even of a non-sexual variety, so that it was expressly defamatory. He did not raise that argument in the trial court and we will not entertain it in the first instance. *See Oparaugo v. Watts*, 884 A.2d 63, 75 (D.C. 2005) ("Points not raised and preserved in the trial court will not be considered on appeal," barring exceptional circumstances).

test if SEIU's statement "was capable of bearing" the meaning that Fells was forced to resign because of sexual misconduct. As to the first and only disputed part of the above test, we have explained that it is not enough that a statement can "be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses that inference." *Id.* at 596 (quoting *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092-93 (4th Cir. 1993)). Evidence that supports such a finding includes "suggestive juxtapositions, turns of phrase, or incendiary headlines." *White*, 909 F.2d at 526.

The SEIU statement at issue provided that Fells' termination was "*the culmination of this stage of the investigation*, which brought to light the serious problems related to abusive behavior towards staff, *predominantly female staff*."[9] (emphases added). Recall that "the investigation" referenced was triggered by allegations that another recently ousted executive, Scott Courtney, was having inappropriate sexual relationships with subordinates. Fells argues that tethering his

---

[9] The trial court's focus on a particular BuzzFeed news article, *supra* note 2, as Fells' "strongest evidence" was misplaced. Fells is not bringing suit against BuzzFeed for impliedly defaming him in an article, but against SEIU for the inferences that can be drawn from the text of its own statement. To the extent the trial court was looking at articles as evidence of how others might reasonably understand SEIU's statement, then the Breitbart article, *supra* note 2, was clearly the stronger evidence on his side. Its very title indicated that Fells was "out of a job because of sexual misconduct charges."

departure to the same internal investigation that led to Courtney's ouster days earlier indicated that he, too, had engaged in sexual misconduct, at least absent any indication to the contrary. *See Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir. 1996) ("[A] defendant does not avoid liability [for implied defamation] by simply establishing the truth of the individual statement(s); rather, the defendant must also defend the juxtaposition of" its statements). We agree that a jury could reach that conclusion.

SEIU counters that the internal investigation was not exclusively about sexual misconduct. It highlights that, upon Courtney's resignation, SEIU's spokesperson described the investigation as one "look[ing] into questions about [1] potential violations of our union's anti-nepotism policy, [2] efforts to evade our Code of Ethics and [3] subsequent complaints related to sexual misconduct and abusive behavior towards union staff."[10]  It is hard to see how that changes the calculus. Sexual misconduct, nepotism, and ethical breaches may all be of a piece, and in the context of the investigation prompting Courtney's resignation, it appeared that they

---

[10] Lewis, *supra* note 1.

were.[11]  In light of that context, the most natural reading is that the investigation was into higher-ups giving preferential treatment to subordinates who acquiesced to their sexual advances—or disfavoring those who did not—checking each box of sexual misconduct, nepotism, and ethical breaches.

But even if that were not enough, there is a second problematic juxtaposition in SEIU's statement suggesting that Fells engaged in sexual misconduct.  It says that his ouster stemmed from "abusive behavior towards staff, *predominantly female staff*." (emphasis added).  When coupled with the earlier reference to an investigation that resulted in another high-level executive's departure for sexual misconduct—and especially in the midst of the roiling #MeToo movement—a reasonable jury could conclude that this statement indicated Fells' misconduct was sexual in nature, and that SEIU intended to so imply.  Indeed, a Breitbart article drew that exact inference, with a headline positing: *Four SEIU Officials Out of a Job Because of Sexual Misconduct Charges*.[12]

---

[11] SEIU seemingly refers to "nepotism" in a broad sense when discussing Courtney's departure and the investigation surrounding it to include preferential treatment not just of family members, but of friends or sexual partners as well.

[12] Starr, *supra* note 2.

The Supreme Court of Minnesota found a similar juxtaposition potentially defamatory in *Phipps v. Clark Oil & Refining Corp.*, 408 N.W.2d 569 (Minn. 1987). In that case, a gas station attendant alleged that he was fired for refusing the request of a customer—who happened to be "handicapped"—to put leaded gasoline into a vehicle designed for unleaded gasoline. *Id.* at 570. Gas station representatives then made factually accurate statements indicating that he had been fired "for failing to provide . . . service to a handicapped customer." *Id.* While technically true, the customer's handicap had nothing to do with the employee's refusal to assist them, and *Phipps* held that there was a triable question of fact as to whether the inclusion of the word "handicapped" gave rise to a false inference that the attendant refused to help the customer *because* of their handicap. *Id.* at 573. Similarly here, it is not obvious why SEIU mentioned that the abuse was predominantly of women, and came to light as part of the investigation into Courtney's sexual misconduct, if not to imply that Fells had engaged in conduct of the same nature. A jury could reasonably adopt Fells' position that doing so amounted to defamation.

Finally, SEIU contends that we might nonetheless affirm on the basis that Fells will be unable to show "actual malice," as required to demonstrate defamation against public figures, as opposed to the negligence showing ordinarily required. The trial court did not resolve that issue, and we "exercise our discretion to leave [it]

for resolution by the trial court in the first instance." *Folks v. District of Columbia*, 93 A.3d 681, 686 (D.C. 2014).

In sum, we conclude that a reasonable jury might conclude that SEIU's statement included the false implication that Fells was ousted for sexual misconduct. We therefore reverse the trial court's dismissal of Fells' defamation claim and vacate its award of attorney's fees and costs.[13]

**III.**

We reverse the trial court's dismissal of Fells' defamation claim, vacate its award of attorney's fees and costs, and affirm the court's dismissal of Fells' remaining claims.

*So ordered*.

---

[13] An award of attorney's fees and costs is permitted even if an Anti-SLAPP motion to dismiss is only partially successful. D.C. Code § 16-5504(a). Because we have upheld the dismissal of three claims of Fells' four claims, the trial court may yet decide that some fee award is warranted. We leave that for the trial court's consideration on remand.