*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 22-CV-0262 & 22-CV-0300

CAPITOL INTELLIGENCE GROUP, INC., *et al.*, APPELLANTS/CROSS-APPELLEES,

v.

GERALD WALDMAN, APPELLEE/CROSS-APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2018-CA-005052-B)

(Hon. Fern Flanagan Saddler, Motions Judge)

(Argued January 16, 2025    Decided March 12, 2026)

*Mark I. Bailen*, with whom *Ariana Woodson* was on the briefs, for appellants/cross-appellees.

*Brandon R. Nagy*, with whom *Michael E. Tucci* was on the briefs, for appellee/cross-appellant.

Before BECKWITH and DEAHL, *Associate Judges*, and LONG, *Senior Judge, Superior Court of the District of Columbia*.[*]

DEAHL, *Associate Judge*: Gerald Waldman is a developer who purchased

property in the Brookland neighborhood that is home to a historic mural and an

---

[*] Sitting by designation under D.C. Code § 11-707(a).

adjoining parking lot that provided clear sightlines to the mural. Peter Semler wanted to purchase the same land, ostensibly to help preserve the mural and its sightlines. He had a contract with the property owner to buy it, but that contract ultimately fell through, and Waldman quickly swept in and bought it at a foreclosure sale that he initiated as a creditor. Semler blames Waldman for cheating him out of the property and for new construction on the land that substantially obstructs sightlines to the mural. As a result, Semler referred Waldman to federal authorities for prosecution for fraud and had some unkind things to say about Waldman—he publicly accused Waldman of "corruption," "having problems with the DOJ," and taking the land "by theft and fraud." Semler also published similar statements on his Capitol Intelligence Group website, a media outlet and co-appellant here.

Waldman sued Semler for defamation. Semler moved to dismiss the claims against him under the District's Anti-SLAPP Act—a statute designed to protect individuals against strategic lawsuits targeting free speech—which is "essentially an expedited summary judgment motion." *Am. Studies Ass'n v. Bronner*, 259 A.3d 728, 740 (D.C. 2021); D.C. Code § 16-5502. The trial court largely denied that motion, dismissing only one of Waldman's claims targeting comments outside the applicable statute of limitations period. Semler now appeals.

We agree with Semler that Waldman did not adduce sufficient evidence to survive the Anti-SLAPP motion to dismiss on any of his claims. As to most of the statements that Waldman complains about, no reasonable jury could conclude on this record that they are in fact false. For the remaining statements that are perhaps false, the worst that can be said of Semler is that he unreasonably accused Waldman of a fraud that he did not in fact engage in. But mere negligence is not enough to sustain a defamation claim against a limited-purpose public figure like Waldman. Waldman must instead prove, by clear and convincing evidence, that Semler acted with actual malice when he published his statements. The record, including Semler's contemporaneous actions that indicate he sincerely believed that Waldman cheated him out of the land and had some bases for those beliefs (even flimsy ones), cannot reasonably support that conclusion by clear and convincing evidence.

We therefore reverse the partial denial of Semler's Anti-SLAPP motion to dismiss and remand the case for further proceedings.

## I. Background

This dispute between Peter Semler and Gerald Waldman centers on a piece of property in the Brookland neighborhood that features a historic mural, *A Survivor's Journey* by Joel Bergner. The mural was painted on the southern side of the Brookland Inn & Café, a building on the property's northern lot. An undeveloped

parking lot abutted the southern side of the Inn, thus providing clear sightlines to the mural. Gerald Waldman held a promissory note on the property that encompassed both the Brookland Inn and its adjoining parking lot, and his note was secured by a first deed of trust. When the Inn's owner fell behind on his debt to Waldman, Waldman sought to foreclose on the property. Peter Semler, in turn, sought to purchase the property in a self-professed effort to preserve the mural. That is when the ensuing yearslong dispute between Waldman and Semler kicked off.

*Foreclosure and contract dispute*

Shortly after Waldman initiated foreclosure proceedings on the property in 2014, Rabindranauth Ramson, the owner of the Brookland Inn, filed for bankruptcy on the Inn's behalf and thereby triggered an automatic stay of any foreclosure sale. While the bankruptcy proceedings were pending, Ramson entered into a contract to sell the property to Semler for $1.6 million—an anticipated voluntary sale that would have staved off Waldman's foreclosure sale. That agreement eventually fell through after Semler accused Ramson of (1) adding an amendment under which Ramson would retain ownership of the vacant lot and be permitted to build a three-story condo complex, and (2) forging Semler's signature on that unapproved modified contract and submitting it to the bankruptcy court. Semler's attorney copied

Waldman's attorney on emails as the dispute between Semler and Ramson unfolded, and Waldman was aware of Semler's allegations about Ramson's forgery at the time.

In the meantime, Waldman successfully moved in the bankruptcy proceedings to lift the automatic stay so that the foreclosure sale could go forward. A few weeks after that, as Semler and Ramson's agreement unraveled, Semler reached out to Waldman in search of a "side deal," cutting Ramson out of the equation. Semler sought to purchase the property directly from Waldman and to possibly have Waldman partially fund that purchase as an investor. At Semler's behest, he and Waldman then met at the Army and Navy Club of Washington to discuss his interest in buying the property from Waldman instead of Ramson. Semler claims that during that meeting, the two "formulated a plan of action" whereby Waldman would buy the property at the foreclosure sale and then sell it to Semler. Waldman does not dispute that the two men discussed something along those lines, though he contends that Semler's pitch was unreasonable and that the two men never reached any sort of deal.

After the meeting, Semler emailed Waldman a "draft deal proposal." Waldman expressed some confusion about what exactly Semler was proposing, and inquired whether the proposal was for Semler to purchase the property at foreclosure and then have Waldman and another investor buy back a 50% interest in it. Semler

responded that he would sit out the foreclosure sale, and that the proposal was for Waldman to purchase the property and "clear Ramson out," then sell the property to Semler. Semler further opined that "for all our sakes we need to have an agreement before the foreclosure auction." There were no further email communications suggesting that Waldman actually agreed to Semler's proposal, and Waldman contends that he "did not accept" any deal with Semler.

The foreclosure sale was held the following week, and Waldman purchased the property for $1.67 million, slightly more than the $1.6 million that Semler had previously agreed to pay Ramson. Semler emailed Waldman with his congratulations, noting "[a]ll we need to [do] now is chase out Ramson and reach a fair and equitable deal." Waldman did not respond, but Semler's attorney followed up with Waldman's attorney the next day recommending that the auctioneer include "assignment" language in the auction paperwork to avoid any double tax payment "on the assumption that [Waldman] plans to sell the property to [Semler]." Waldman's attorney responded that they "already included" the proposed language and added that "[g]reat minds think alike" but did not otherwise comment on the prospect of any sale to Semler.

About two weeks later, Semler emailed Waldman with another proposed outline of a deal, reiterating that he "remain[ed] very interested in buying the

Brookland property." Waldman responded that he was "interested in some arrangement as suggested by you," but Waldman insisted on "maintain[ing] ownership of the adjoining vacant portion of the property," and advised Semler that "if you care to do anything you need to move quickly." Their talks again appeared to hit a standstill from there.

Semler's attorney, Benny Kass, sent a letter to an attorney in the U.S. Trustee's Office (USTO) about a month later. Kass asked the USTO to investigate the apparent forgery that scuttled Semler's contract to buy the property from Ramson. That letter outlined Semler's allegations that he had a contract to purchase the property from Ramson and that Ramson later doctored and submitted to the bankruptcy court a "substitution of contract" that Semler never agreed to, describing that as "at best an irregularity or at worst a forgery." The letter noted Semler "was unable to go to closing and the property was sold at a foreclosure sale" to Waldman due to Ramson's machinations. The letter also asserted that Waldman "was aware of the [contract] problem . . . prior to the foreclosure sale." Semler forwarded the letter to Waldman, claiming it would help get Ramson—who apparently had not yet vacated the Inn—"out of the picture." He further made a new purchase offer for just the northern lot of the property, with Waldman holding onto the southern parking lot as he had previously insisted. Waldman did not respond, and that was the end of

any discussion between the men about Waldman selling Semler any portion of the lot.

A year later, Semler began personally contacting the USTO. Semler called and emailed Bradley Jones, the USTO attorney Kass had previously reached out to, and offered "to file criminal charges or supply . . . a signed affidavit" about the "fraud" related to the property's sale. Semler was now claiming that Waldman must have been in on the fraud with Ramson, and he alleged that Waldman "reneged on his promise to resell the property" to him, knew about Ramson's forgery, and told Semler that "Ramson did it and has done it before." Semler also revealed his attorney initially refused to report the "irregularities" to the bankruptcy court and sent the earlier letter to USTO only at Semler's urging. A different USTO attorney, Joseph Guzinski, responded. Guzinski emailed Kass about Semler's email and asked to meet about the "alleg[ed] criminal acts in connection with" Semler's efforts to purchase the property. Guzinski indicated that he wanted "to arrange a conference call with [Kass] and [Semler] to discuss the matter." But Kass, who unbeknownst to Guzinski no longer represented Semler, never responded.

Later that year, Semler emailed Jones and Guzinski, claiming that "a person close to . . . Ramson[] indicated that Mr. Ramson is willing to testify against

Mr. Waldman." Semler again offered his availability if the office decided to "pursue further investigation or criminal charges in the matter," but received no response.

*The 2017 Askale Café confrontation*

Several weeks after Semler's more recent outreach to the USTO—and now two years after the foreclosure sale—Semler confronted Waldman at Brookland's Askale Café. Semler filmed the encounter, which lasted about a minute. Semler approached Waldman, asking "you know that whole issue with Brookland Inn is still in U.S. Trustees?" Semler told Waldman that "the neighborhood doesn't want you to bring down the mural," while an apparently exhausted Waldman first asked Semler to "please leave me alone," and then told him to "get away from me," adding "there's something wrong with you" and "you're a sick person." Semler went on to accuse Waldman of "mortgage fraud," and Waldman responded that if Semler was going to make those allegations "public" he would "end up in court." Semler said he "would love to" end up in court, adding that he had already "brought it to Justice, to its trustee," an apparent reference to his outreach to USTO.

A few months later Semler went to the USTO's office to try to meet with Guzinski in person, but he was told they could not formally discuss the matter. Semler sent a follow-up email to Guzinski later that day indicating that Kass no

longer represented him and again offered to meet "to discuss the fraud issues." Neither Guzinski nor anybody else from USTO ever followed up with Semler.

*The 2018 BNCA meeting and Capitol Intelligence Group article*

Meanwhile, Waldman sold the vacant parking lot to a different developer, District Quarters. At a Brookland Neighborhood Civic Association (BNCA) meeting in 2018, a District Quarters representative presented a proposal for developing the vacant lot into a nine-unit condominium building. The proposed building would have left the mural untouched, but it would have largely blocked the sightlines to it. Waldman attended that BNCA meeting and promoted the development plans while often assisting the presenter in explaining its contours. Semler also attended the meeting to oppose the plans and, once again, filmed the interaction.

Semler and Waldman first mixed it up after one of the meeting's attendees asked if the proposed development was on the lot "with the mural?" When Waldman explained that it was the lot next to the mural, the attendee asked "how are you building nine units in that parking lot?" Semler interjected that "it's a landmark of our neighborhood they're gonna build up" and stated, "Mr. Waldman has always planned that . . . and you're also having problems with the DOJ." Waldman responded that he had not always planned to build up on the lot, but that District

Quarters "proposed a really nice building" with a "beautiful plan for the property" and so he sold them the lot. Semler chimed in again about a minute later to say "nobody here knows . . . Mr. Waldman is blocking a construction hotel at his West Palm Beach thing," an apparent reference to an unrelated dispute that saw Waldman—a West Palm Beach resident—locked in litigation with some of his neighbors in Florida. Waldman replied "please stop attacking me . . . what's wrong with you?" Semler responded "I'm not attacking you, it's just truth . . . because you took this by theft and fraud . . . everybody else should know."

After a ten-minute break in hostilities, Semler jumped in again to say, "this building will block one of the most iconic" landmarks in Brookland, that "Mr. Waldman has always been wanting to pop up," and suggesting that he would "take it to federal court." As the discussions continued, another attendee expressed frustration with District Quarters' representative, explaining that "we don't feel like he's working with us at all. We feel like he's telling us what he's doing . . . instead of D.C. being run by D.C." residents. Semler took that as an opening to add, "that's why they have to do everything under the table—bribery, corruption—to get this far." One of the organizers later told Semler that he was "interrupting the meeting" and told him to "calm down." That amped up Semler to add that this was "pure corruption Brookland style," and Semler then made his way for the exit. When Waldman facetiously asked "who was in charge of [the] corruption," Semler

responded on his way out the door, "You are. You are already in the Trustees of the U.S. Justice Department sir."

Semler later published both the Askale Café and the BNCA videos to YouTube. He then embedded both videos in an article on his Capitol Intelligence Group website, which he bills as a news service, that called Waldman a "vandal" who wanted to "obliterate" the mural. The YouTube video descriptions and the article—both authored by Semler—claimed that Waldman "has been cited for real estate fraud to the US Trustee" and that he "is subject to a criminal bankruptcy fraud complaint with US Trustee of the Department of Justice" in relation to the property.

*Waldman's suit and the Anti-SLAPP Act motion to dismiss*

Waldman sued Semler and Capitol Intelligence Group for defamation and false light, alleging Semler's "accusations falsely impute criminal activity and corruption in the development process" and were "injurious to . . . Waldman professionally as a developer and personally as a long-time stakeholder and member of the Brookland community." Semler filed a special motion to dismiss under the District's Anti-SLAPP Act, arguing his speech was protected because it related to the public's interest in the mural and development, and that Waldman was a limited-purpose public figure as to those topics. Semler principally contended that Waldman could not substantiate his claims that Semler's statements were false or made with

actual malice. Semler also argued that Waldman's suit was untimely as to the 2017 Askale Café encounter, as the statute of limitations for any claim related to that confrontation had expired.

As contemplated by the Anti-SLAPP Act, the trial court permitted targeted discovery on two issues, *see* D.C. Code § 16-5502(c): (1) whether Waldman was a limited-purpose public figure, and (2) whether Waldman was under investigation by the USTO at the time of Semler's statements, and Semler's actual knowledge about any investigation or lack thereof.

Through discovery, Waldman obtained declarations from USTO attorneys Jones and Guzinski, and neither of them would confirm or deny the existence of any past or present investigation into Waldman. Jones said that the USTO's policy was not to "comment on any ongoing investigations or criminal referrals" and that he did not know if any criminal referral was made in Waldman's case. Consistent with that policy, Jones indicated that he "would not have stated" to Semler or anybody else whether Waldman was under investigation "for bankruptcy fraud or any criminal matter" but would have "stated only that [USTO was] reviewing the documents" that Semler had sent them. Guzinski likewise indicated that he "strictly adhered" to the same policy and would not have "stated or implied to Mr. Semler that Mr. Waldman was under any type of civil or criminal investigation." Guzinski acknowledged that

he spoke with Semler about his allegations on two occasions: once when Semler called Guzinski and another "brief unscheduled meeting at my office"—an apparent reference to Semler's drop-in visit to USTO in 2017.

The trial court largely denied Semler's motion to dismiss. It concluded (1) that Waldman was a limited-purpose public figure on the topics that Semler spoke about, given the Brookland community's interest in new developments and its narrower interest in the mural, meaning that Waldman would be required to prove that Semler acted with "actual malice," but (2) that a properly instructed jury could nonetheless conclude from the evidence that Semler "made false defamatory statements concerning" Waldman with actual malice. The court focused on Semler's statements suggesting that Waldman was under some investigation and had been "cited by" the USTO—an apparent reference to Semler's assertion that Waldman had been "cited . . . *to*" the USTO. The court reasoned that a reasonable jury could conclude by clear and convincing evidence that Semler knew those statements were false because it was "unlikely" that "Semler would repeatedly attempt to initiate a criminal investigation against" Waldman by persistently reaching out to USTO attorneys "if he actually believed that [Waldman] was already being investigated."

The trial court did, however, partially grant Semler's motion to dismiss on statute of limitations grounds as it related to the 2017 Askale Café confrontation,

though it originally did so under Super. Ct. Civ. R. 12(b)(6). Then in a subsequent order partially granting Semler's motion to reconsider, it dismissed Waldman's 2017 Askale Café claim under the Anti-SLAPP Act instead, thereby making it easier for Semler to recoup his attorney's fees for his partially successful motion.

## II. Analysis

Semler now appeals the partial denial of his motion to dismiss. We have jurisdiction to review that challenge. *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1232 (D.C. 2016).

The District's Anti-SLAPP Act provides defendants with a special motion to dismiss mechanism to quickly defeat suits "aimed to punish or prevent opposing points of view." *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 579 (D.C. 2022) (quoting *Am. Stud. Ass'n v. Bronner*, 259 A.3d 728, 733 (D.C. 2021)). When a defendant makes a prima facie showing that their speech is protected by the Act, the plaintiff must show his claims are "likely to succeed on the merits" to survive a special motion to dismiss. D.C. Code § 16-5502(b). "This standard is akin to the summary judgment standard . . . except that the non-moving party bears the burden under the Anti-SLAPP Act." *Fells*, 281 A.3d at 580 (citing *Mann*, 150 A.3d at 1237). That is, we ask "whether a jury properly instructed on the law, including any applicable heightened fault and proof requirements, could reasonably find for the

claimant on the evidence presented." *Mann*, 150 A.3d at 1236. And as with appeals from summary judgment rulings, we conduct a de novo review of the trial court's Anti-SLAPP dismissal rulings. *Id.* at 1240.

We first consider whether Semler made a prima facie showing that the Anti-SLAPP Act applies. Concluding that he did, we next evaluate whether Waldman was likely to succeed on the merits. That requires us to first address whether Waldman is a limited-purpose public figure, and because we conclude that he is, Waldman's suit can survive the motion to dismiss only if he proves by clear and convincing evidence that Semler published his allegedly defamatory statements with malice. With that standard in mind, we finally assess the alleged defamatory statements and conclude that Waldman failed to show that he was likely to succeed on the merits of his claims so that his suit should have been dismissed.

*A. Semler made a prima facie showing that the Anti-SLAPP Act applies*

Waldman first argues that the Anti-SLAPP Act is not even applicable here because Semler did not make the required "prima facie showing" that Waldman's claims arose "from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b). In Waldman's telling, Semler's statements did not relate to a topic of "public interest," but instead concerned only his private economic interests in personally buying the property. We disagree.

What qualifies as an issue of public interest "should be liberally interpreted." *Saudi Am. Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.*, 242 A.3d 602, 611 (D.C. 2020). It includes, among other things, issues "related to . . . economic, or community well-being." D.C. Code § 16-5501(3). And activity need not be exclusively related to issues of public interest to be covered by the Anti-SLAPP Act—the Act covers statements that "intermix[] public and private interests." *Saudi Am.*, 242 A.3d at 611.

Semler's statements clearly related to a topic of public interest, to wit, the preservation of a historic mural, urban development, and the potential malfeasance of a particular developer. Waldman counters that Semler's statements were motivated by his own private economic interests, instead of by any public betterment, but that is beside the point. "A speaker's self-interested motivations say little about whether the content of their speech is related to issues of public interest." *Fells*, 281 A.3d at 583. Semler does not need to "disprove any private motivation here," *id.*; he needs only to show that his statements relate to issues of public concern. He's done that. His statements dovetail with economic and community wellbeing broadly and with the mural and condo development more narrowly. Whatever his motivations were, those statements fall in the heartland of what the Anti-SLAPP Act covers.

*B. Waldman is not likely to succeed on his defamation claims*

Because the Anti-SLAPP Act applies, Waldman must demonstrate his claims are "likely to succeed on the merits" to avoid dismissal. D.C. Code § 16-5502(b). Waldman targets two different threads of statements that Semler made at the 2018 BNCA meeting and in the article where he embedded the video of that meeting. First are the "government investigation statements" that the trial court focused on, where Semler suggested that Waldman was embroiled in some non-descript investigation. Second are what we will call the "fraud and corruption allegations," where Semler attributed general malfeasance to Waldman in how he procured and developed the property at the center of this dispute.

To succeed on his defamation claims, Waldman must prove (1) that at least one of those statements was false and defamatory; (2) that Semler published the statement without privilege; (3) that Semler had the requisite culpable mindset when publishing the statement; and (4) either that the statement was actionable as a matter of law or that its publication caused Waldman special harm. *See Mann*, 150 A.3d at 1240. The parties tangle over the first and third elements above, that is, the extent to which the evidence could prove that Semler's statements were false and defamatory and made with the requisite culpable mindset.

Before diving into those two central disputes, we first resolve a threshold debate among the parties about whether Waldman is a private or a public figure in relation to the topics that Semler was speaking about, as that affects the degree of culpability that Waldman must prove to sustain his defamation claims. If Waldman is a purely private figure, he could succeed on a defamation claim if he could prove by a preponderance of the evidence that Semler, through his media outlet Capitol Intelligence Group, published false and defamatory statements about Waldman with mere negligence. *See Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 80 (D.C. 1980); *Mann*, 150 A.3d at 1251-52.

But if Waldman is instead a public figure, he "faces a 'daunting' summary judgment standard" that is "significantly more onerous than the usual preponderance of the evidence standard" applicable if he were a private figure. *Kahl v. Bureau of Nat'l Affs, Inc.*, 856 F.3d 106, 116 (D.C. Cir. 2017) (Kavanaugh, J.) (first quoting *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016), then quoting *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987)). When it comes to public figures and "limited" public figures whose prominence is confined to a narrower sphere, we jealously guard additional "'breathing space' for uninhibited expression," even when the speech would otherwise be actionable if aimed at a private individual. *Mann*, 150 A.3d at 1251 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). We provide that additional breathing space in two ways where the plaintiff is a public

figure: (1) the plaintiff must make a "heightened showing of fault—actual malice," *id.* (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)), which means they must show the speaker knew that their statements were false or that they in fact entertained serious doubts about their veracity; and (2) the plaintiff must demonstrate that actual malice by "clear and convincing evidence," *id.* at 1252 (citing *N.Y. Times Co.*, 376 U.S. at 285-86)—a mere preponderance will not suffice.

### 1. Waldman is a limited-purpose public figure

Our precedents recognize two different types of public figures: There are "general public figures" who have reached "such pervasive fame or notoriety that" they are public figures "for all purposes and in all contexts." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). And then there are "limited-purpose public figures," or those people who have assumed some role "'in the forefront of particular public controversies in order to influence the resolution of the issues involved,' and who are deemed public figures only for purposes of the controversy in which they are influential." *Moss v. Stockard*, 580 A.2d 1011, 1030 (D.C. 1990) (quoting *Gertz*, 418 U.S. at 345). Everybody agrees that Waldman is not a general public figure. Semler maintains only that Waldman is a limited-purpose public figure, as the trial court concluded.

We apply a three-part test for assessing whether Waldman is a limited-purpose public figure in the context of the controversy that Semler's comments concerned: (1) whether the underlying debate was the subject of public discussion prior to the alleged defamation; (2) whether Waldman achieved special prominence in that debate, either by purposely trying to influence its outcome or because he otherwise could realistically have been expected to have an impact on its resolution; and (3) whether the alleged defamation was germane to the role Waldman played in the debate. *See Fells*, 281 A.3d at 583. There is no dispute about the first prong: The condo development and the historic mural's preservation were the subjects of public debate prior to Semler's statements at the 2018 BNCA meeting and the follow-up article that Waldman's suit targets.

As to the second prong, we agree with Semler that Waldman had "achieved special prominence" in the debate about the mural and the development of the Brookland property. He purchased the land where the mural was housed, paved the way for the development of the southern parking lot, and was a leading proponent of the condo proposal. He thus "voluntarily thrust" himself into the debate. *See Doe No. 1 v. Burke*, 91 A.3d 1031, 1042-43 (D.C. 2014). Waldman counters that by the time of the BNCA meeting, he had sold the land to District Quarters so that he had no more prominence in the debate than any other member of the public who attended the meeting. The record is to the contrary. Whether Waldman still owned the

property or not, he "len[t] his reputation" to the ongoing project and "purposely tr[ied] to influence the outcome" of the community discussion when he vehemently advocated for District Quarters' "beautiful plan" for a "really nice building." *See Fells*, 281 A.3d at 583. And while he was sitting in the audience at the 2018 BNCA meeting, he might just as well have stood on stage alongside District Quarters' representative—for all intents and purposes they were jointly advocating for the proposed development.

As for the third prong, Semler's statements were germane to that public debate. A "statement is germane unless it is 'wholly unrelated to the controversy' for which the plaintiff is a limited" public figure. *Fells*, 281 A.3d at 583 (quoting *Moss*, 580 A.2d at 1031). Here, all of Semler's statements quite directly related to the mural and Waldman's development of the property that housed it. Waldman once again attempts to frame Semler's statements as directed only toward a private contract dispute over the land, distinct from the public debate about the mural and the condo development next door. That framing fails. Whether a developer privately acquired property through underhanded tactics, malfeasance, or by defrauding other potential buyers is of direct interest to a community concerned about gentrification and historic preservation. Semler's statements were not "wholly unrelated" to those public debates. They speak to whether that developer can be trusted going forward.

That is all to say that the heightened standards applicable to defamation claims brought by public figures apply here, so that Waldman must prove that Semler's statements were false and further prove, by clear and convincing evidence, that they were delivered with actual malice. We now examine whether Waldman's evidence can clear both of those evidentiary thresholds as to either Semler's "government investigation" statements or his "fraud and corruption" statements.

## 2. Semler's government investigation statements were not false

We start with the government investigation statements: that Waldman was "cited for real estate fraud to [the USTO]," "subject to a criminal bankruptcy fraud complaint with [the DOJ]," and had "problems with the DOJ." Semler defends these statements as substantially true because (1) he did in fact report Waldman for bankruptcy fraud to the USTO, a component of DOJ; and (2) the USTO was at least interested enough in his allegations to follow-up with Semler in an attempt to "arrange a conference call with [Kass] and [Semler] to discuss the matter." We agree with Semler that these statements were not false, even if we assume that Waldman could prove that any USTO investigation into him never proceeded past the incipient stage of briefly looking into Semler's complaint.[1] Semler did not say or even imply

---

[1] The USTO attorneys' refusal to indicate the extent to which any investigation into Waldman progressed raises a pretty serious hurdle for Waldman, but we will assume he could surmount it: Waldman points to the fact that he

that the investigation had proceeded past a nascent stage, such as to a criminal charge or an indictment.

Waldman counters that Semler "complaining to the USTO is not a 'criminal' 'citation' or 'complaint' as those words are commonly understood," because of course Semler "has no legal authority to 'cite' or issue a 'criminal complaint' to anyone for anything." It is true enough that Semler's complaints to the USTO did not amount to a criminal citation, but he never said that Waldman was criminally cited *by* USTO (contrary to the trial court's retelling). He said that Waldman was cited *to* USTO, which is consistent with Semler bringing a complaint to the USTO's attention, as he had done. And while we agree that neither Semler nor anybody else issued a "criminal complaint" to Waldman—whatever that would mean—Semler did not say otherwise. He said that Waldman was "subject to" a criminal complaint. That is a stilted phrase, to be sure, but it comports with the facts on the ground: that a complainant (Semler) had alerted authorities to suspected criminal wrongdoing. And Semler's statement that Waldman had "problems with the DOJ" is both

---

conducted case searches in both the District's and in Maryland's courts which revealed no pending criminal cases against him, and he also argues that, "[h]ad the USTO investigated Waldman and found any wrongdoing, it is inconceivable that the Trustee would not have alerted the bankruptcy court by filing something in the docket," and yet it never did so. Maybe those facts plus the general difficulty with proving a negative would permit a reasonable factfinder to conclude that any investigation into Waldman never progressed past briefly examining Semler's complaints. Even on that assumption, Semler's statements simply were not false.

extraordinarily vague—query whether it is even capable of being false—and again consistent with even a nascent DOJ investigation into Waldman prompted by Semler's own complaints.

We acknowledge that Semler was walking a pretty fine line and perhaps on the edge of stepping into falsehood by implication, but he never stepped over that line. We are mindful that alleged defamatory "statements must be examined within the context of the entire article," *Clawson v. St. Louis Post-Dispatch*, 906 A.2d 308, 313-14 (D.C. 2006) (brackets omitted) (quoting *Heard v. Johnson*, 810 A.2d 871, 886 (D.C. 2002)), and the body of Semler's statements also make it clear that he was the one who brought a criminal complaint to USTO. As captured in the 2017 Askale Café video, embedded alongside the BNCA video in Semler's article, Semler explained that he was the person who "brought" the complaints "to Justice, to its trustee." When viewing Semler's statements in context, we do not think they assert anything beyond a nascent investigation prompted by Semler himself, which is consistent with the facts on the ground, regardless of whether the investigation moved beyond that incipient stage.

### 3. Semler's fraud and corruption statements were not delivered with malice

Waldman next targets Semler's statements that Waldman "took [the property] by theft and fraud" and "do[es] everything under the table—bribery, corruption."

Semler argues that these statements were not "capable of a defamatory meaning," because listeners would not interpret them literally but would understand them to be the type of "rhetorical hyperbole" expected in staunch advocacy. *See Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594-97 (D.C. 2000). We doubt that all of Semler's descriptors could be chalked up to the "imaginative expression" or "rhetorical hyperbole" that we have previously deemed inactionable, *id.*, but we need not resolve that question.[2] Even assuming these statements were capable of bearing defamatory meaning and were in fact false, Waldman cannot show by clear and convincing evidence that Semler delivered them with actual malice.

Actual malice requires proof that the defendant "actually knew" his statements were false or acted with "reckless disregard for whether or not [they were] false." *Mann*, 150 A.3d at 1252 (quoting *Burke*, 91 A.3d at 1044). The "reckless

---

[2] We also reserve judgment on whether the "bribery, corruption" statement could be reasonably understood as describing Waldman at all. Notably, Semler made that comment piggybacking on another meeting attendees' expressed frustration with District Quarters, not Waldman. After that attendee complained that District Quarters was merely telling the residents what they were doing, rather than working with them, Semler added "that's why they have to do everything under the table—bribery, corruption." That comment is perhaps best understood as targeted at District Quarters, or developers in the District more generally, rather than Waldman in particular. In any event, we will assume for the sake of argument— especially in light of the general tenor of Semler's other comments—that a reasonable listener might understand Semler to have lumped Waldman in with those engaged in bribery and corruption.

disregard" measure requires "a showing higher than mere negligence"—the plaintiff must prove the defendant made the publication with "a high degree of awareness of [the statement's] probable falsity" or "entertained serious doubts as to [its] truth." *Id.* at 1252 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) and *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (cleaned up)). Critically, a defendant's sincere belief in the truth of his claims does not automatically foreclose a finding of actual malice where the claims were "fabricated by the defendant," were "the product of his imagination," or where he in fact had "obvious reasons to doubt the veracity of" the claims. *St. Amant*, 390 U.S. at 732. But neither is reckless disregard "measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* at 731. The question is a subjective one: whether the defendant in fact entertained serious doubts about the truth of what he said. *See Mann*, 150 A.3d at 1252. Waldman does not have evidence that could prove Semler knew his statements were false, or harbored such doubts, by clear and convincing evidence.

Semler's actions as this dispute unfolded bespeak somebody who sincerely believed Waldman had cheated him out of the Brookland property, and he had some (even if flimsy) basis for that belief. Starting in 2015, Semler's emails outlined the basis for his belief that Waldman cheated him, or more colloquially "defrauded" him, during the foreclosure process. He reported his allegations to the USTO—a

component of the DOJ—and persisted in those reports over the course of several years. The USTO attorneys requested a call with Semler and his attorney to discuss the matter at one point, neither attorney ever informed Semler they were *not* investigating his claims, and one of the attorneys told him his office was "looking into" the matter.

Waldman pushes back on multiple fronts. He notes that Semler's fraud accusations evolved over time, starting with complaints about Ramson's forgery of the contract addendum and only later implicated Waldman in the alleged wrongdoing—a logical leap, Waldman contends, that Semler made without any basis. Waldman further argues that the 2015 emails between Waldman and Semler plainly show the two men never reached a concrete deal for the property, and that Semler knew as much, so that any later claim of being "defrauded" out of the property was a post hoc fabrication. He points to the fact that Semler's own attorney, Kass, refused to file fraud allegations in the bankruptcy court and sent the letter to the USTO only at Semler's urging, which Waldman characterizes as an "expression of doubt" about the merits of those claims. And he contends that Semler's repeated outreach to the USTO over nearly two years—each time volunteering to file an affidavit or provide further information—belies the notion that Semler believed an investigation was already underway.

There is some force to these arguments. We agree with Waldman that the 2015 emails between him and Semler show fairly conclusively that the two men never reached a concrete deal for the property, and they likewise seem to show that Semler was aware of that fact. There is thus no question that a reasonable jury could find that Semler's accusations that Waldman "took" the property "by theft and fraud" were unreasonable—he did not have a strong basis for those allegations on this evidence. But there is a substantial gap between unreasonable allegations and allegations that are knowingly or recklessly false, and that is a gap that Waldman cannot bridge. *See Phillips*, 424 A.2d at 83 (upholding summary judgment ruling in favor of defamation defendant because, despite falsity of published statement, there was "no evidence of common law malice (ill will) or knowing or reckless publication in the undisputed facts"); *Kahl*, 856 F.3d at 116 (directing summary judgment for defamation defendant, noting that "falsity alone does not equate to malice" and finding "insufficient evidence, direct or circumstantial" for malice to get to a jury).

Start with the emails. They show that Semler, misguided though he may have been, believed that he and Waldman had some agreement in principle to work together going forward, even if the details of the exchange had not yet been finalized. Waldman expressed interest in "some arrangement as suggested by" Semler; Waldman's attorney agreed that the auctioneer should include assignment language in the auction paperwork and remarked that "[g]reat minds think alike"; and

Waldman continued to engage with Semler about a possible sale for weeks after the auction. A speaker's "adoption of one of a number of possible rational interpretations" of ambiguous events is "not enough to create a jury issue of 'malice' under *New York Times*." *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971). Semler's conduct at the foreclosure auction further suggests the sincerity of his beliefs, however unfounded they may have been. If Waldman is right that Semler knew at the time of the auction that Waldman never agreed to sell him the property, Waldman has offered no ready explanation for why Semler did not bid on the property at the foreclosure sale, where it sold for roughly the same amount that Semler had previously agreed to pay Ramson. The most natural explanation is the one that Semler offers: He stayed out of the bidding because he believed he already had a side deal with Waldman. That may well have been a naïve or unreasonable belief, but it does not bespeak someone who understood that Waldman had not even so much as informally agreed to work with him.

The evolution of Semler's complaints to the USTO also does not suggest that he knew his allegations were unfounded, contrary to Waldman's arguments. Waldman is correct that Semler's complaints started with accusations about Ramson and only later expanded to encompass Waldman. But that history is more consistent with Semler piecing together what he thought had happened over time, rather than with any wholesale fabrication by Semler. Months after the foreclosure sale, Semler

learned that Ramson and Waldman "had been business partners in the purchase of other properties." He also watched as Waldman sold the lot to District Quarters, which proposed a condo development that bore some resemblance to the kind of project contemplated by Ramson's seemingly improper modification to his contract with Semler. Those events provide a ready explanation for how Semler came to conclude, perhaps unreasonably, that Waldman had conspired with Ramson to scuttle Semler's deal to purchase the property. Even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" will not alone support a finding of actual malice. *Harte-Hanks*, 491 U.S. at 666.

We also note what the record does *not* contain. While Waldman was permitted to conduct limited discovery on the question of actual malice, including Semler's "actual knowledge" about the extent of any investigations, Waldman never deposed Semler. There may have been sound strategic reasons for that, but where the critical question here is whether Semler knew his statements were false or subjectively entertained grave doubts about that, Waldman's failure to develop any record on Semler's actual state of mind via deposition leaves a glaring gap in the evidence. *See Secord v. Cockburn*, 747 F. Supp. 779, 787 (D.D.C. 1990) (noting "the plaintiff has even failed to depose these three defendants" in granting summary judgment against public figure plaintiff in defamation suit). Actual malice is a

subjective standard that "necessarily contemplate[s] examination of the [speaker's] editorial process to prove the necessary awareness of probable falsehood." *Herbert v. Lando*, 441 U.S. 153, 156, 172 (1979). Waldman had the opportunity to directly probe what Semler actually knew, and he took a pass.

Waldman also failed to supply any affidavit or deposition testimony from Ramson, who was seemingly the one person who could have testified to whether Waldman had any involvement with his apparent fraud. Semler directly accused Waldman of "collud[ing]" with Ramson in the contract modification, and his emails to USTO make it apparent he formed this belief before ever making his public statements. Waldman's only evidentiary response is his own declaration claiming he "had nothing to do" with the contract dispute and he asks us to infer Semler is now offering "self-serving" post-hoc explanations. But Waldman's failure to adduce anything from Ramson is another glaring omission of evidence that otherwise might have cast doubt upon Semler's sincerity in his beliefs that Waldman had cheated him. Absent a deposition or other proof of Semler's state of mind, the circumstantial evidence here is simply not strong enough to clearly and convincingly prove anything beyond that Semler was perhaps unreasonable in making his allegations without a sufficient basis. It does not clear the hurdle of actual malice.

At bottom, when viewing the evidence in the light most favorable to Waldman, the worst that can be said of Semler is that he unreasonably accused Waldman of a fraud that Waldman did not in fact commit. But mere unreasonableness is not actual malice. Nothing in the record demonstrates that Semler made up his fraud allegations or was simply trying to punish Waldman through falsehood he knew or strongly suspected was false. *See Tavoulareas*, 817 F.2d at 795 ("[P]laintiffs cannot ground their [defamation] claim 'on a showing of intent to inflict harm,' but must, instead, show an 'intent to inflict harm through falsehood.'" (quoting *Henry v. Collins*, 380 U.S. 356, 357-58 (1965))). The evidence would not permit a factfinder to conclude, by clear and convincing evidence, that Semler made his statements with actual malice.

Because Waldman failed to produce evidence sufficient to satisfy the heightened fault and proof requirements applicable to limited-purpose public figures like him, his claims were not likely to succeed on the merits and should have been dismissed under the Anti-SLAPP Act. D.C. Code § 16-5502(b).[3]

---

[3] Waldman also brought a distinct "false light" claim, but the parties make no independent arguments about that claim—they seem to agree that it rises or falls along with his defamation claims. That claim likewise must be dismissed under the foregoing analysis. "[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Blodgett v. Univ. Club*, 930 A.2d 210, 222-23 (D.C. 2007) (quoting *Klayman v. Segal*, 783 A.2d 607, 619 (D.C. 2001)).

### III. Conclusion

For the foregoing reasons, we reverse the trial court's denial of Semler's special motion to dismiss under the D.C. Anti-SLAPP Act and remand the case for further proceedings consistent with our holding.[4]

*So ordered.*

---

[4] The parties dispute whether we have jurisdiction over Waldman's cross-appeal challenging the dismissal of one of his claims on statute of limitations grounds. That was not a final order disposing of the entire case, and we have never examined whether a plaintiff can appeal a partial dismissal under the Anti-SLAPP Act where the defendant has appealed a partial denial of their motion. Because we conclude that Waldman's suit should have been dismissed in its entirety regardless, we have no occasion to reach Waldman's cross-appeal, and we do not resolve whether we would have jurisdiction to entertain it.